UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EMMANUEL CONSTANT,

        Petitioner,

  – against –

DANIEL MARTUSCELLO,
*Coxsackie Correctional Facility
Superintendent,*

        Respondent.

**MEMORANDUM, ORDER &
JUDGMENT**

14-CV-1912

**Appearances**

**For Petitioner:**

    Gary Schoer
    6800 Jericho Turnpike
    Syosset, NY 11791
    (516) 496-3500
    gschoer@aol.com

**For Respondent:**

    Alyson Joy Gill
    Nikki Kowalski
    Hannah Stith Long
    Office of the New York State Attorney General
    120 Broadway, 22nd Floor
    New York, NY 10271
    (212) 416-8729
    alyson.gill@ag.ny.gov
    nikki.kowalski@ag.ny.gov
    hannah.long@ag.ny.gov



**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.   INTRODUCTION ....................................................................................................3
II.  FACTS ...................................................................................................................6
    A. Crime of Conviction ......................................................................................6
        1. Mortgage Fraud Scheme ..........................................................................6
        2. Jury Verdict ...............................................................................................7
        3. Sentence .....................................................................................................8
III. PROCEDURAL HISTORY ......................................................................................8
    A. Plea Allocution ...............................................................................................8
    B. Third Party Informs Court of Petitioner's Alleged Crimes in Haiti ...............11
    C. Post-Plea Sentencing ....................................................................................15
        1. First Hearing ...........................................................................................15
            a.   Department of Homeland Security Requests Time Served ...............15
            b.   Center for Constitutional Rights Requests Lengthy Sentence ..........16
            c.   Decision Deferred ...........................................................................17
        2. Center for Constitutional Rights Submits Additional Documents .........19
        3. Second Hearing .......................................................................................25
        4. Guilty Plea Vacated ................................................................................27
        5. Third Hearing .........................................................................................29
            a.   Petitioner Offered Revised Plea Deal .............................................29
            b.   Revised Plea Deal Rejected by Petitioner .......................................29
            c.   Revised Plea Deal Again Rejected by Petitioner ............................30
    D. Trial .............................................................................................................30
        1. Case Presented to Jury ...........................................................................30
        2. Jury Instructions .....................................................................................32
            a.   Scheme to Defraud .........................................................................32
            b.   Grand Larceny in the Third Degree ...............................................33
            c.   Grand Larceny in the Second Degree .............................................33
            d.   Falsifying Business Records in the First Degree .............................34
        3. Deliberations and Verdict ......................................................................35
    E. Post-Conviction Sentencing .........................................................................35
    F. Motion to Set Aside Sentence ......................................................................37
    G. Direct Appeals .............................................................................................38
    H. Instant Petition ............................................................................................41
IV. APPLICABLE STANDARD OF REVIEW .................................................................41
    A. Antiterrorism and Effective Death Penalty Act ...........................................41
        1. "Contrary to" Clause ..............................................................................42
        2. "Unreasonable Application" Clause .......................................................42
    B. Deference to State Court ...............................................................................43
    C. Harmless Error .............................................................................................45
V.  PLEA AGREEMENTS ...........................................................................................45
    A. History ..........................................................................................................46
        1. Influence of English Practices ................................................................46
        2. Early American Practices and Controversies (1700s–1850s) .................47

|   |   | a. | Expeditious Nature of Criminal Trials | 47 |
|   |   | b. | Judicial Moral Disapproval of Plea "Bargaining" Process | 48 |
|   | 3. | Upsurge in Plea Deals (1850s–1970s) | | 49 |
|   | 4. | Modern Acceptance (1970s–Today) | | 52 |
| B. | Law | | | 53 |
|   | 1. | Judicial Discretion to Vacate Plea Bargains | | 53 |
|   | 2. | Information Considered Regarding Appropriate Sentence | | 56 |
|   |   | a. | Breadth | 56 |
|   |   |   | i. Presentence Report | 59 |
|   |   |   | ii. *Ex Parte* Communications | 59 |
|   |   | b. | Due Process Considerations | 60 |
|   | 3. | Specific Performance | | 61 |
| C. | Application | | | 64 |
| VI. | DOUBLE JEOPARDY | | | 66 |
| A. | Law | | | 66 |
| B. | Application | | | 69 |
| VII. | IMPROPER SENTENCING | | | 70 |
| A. | Law | | | 70 |
| B. | Application | | | 71 |
| VIII. | INSUFFICIENT JURY INSTRUCTIONS | | | 72 |
| A. | Law | | | 72 |
| B. | Application | | | 75 |
| IX. | INEFFECTIVE ASSISTANCE OF COUNSEL | | | 75 |
| A. | Law | | | 75 |
|   | 1. | Standard | | 76 |
|   | 2. | Rule as Applied to Trial Counsel | | 79 |
|   |   | a. | Calling of Witnesses on Behalf of Defendant | 79 |
|   |   | b. | Failure to Object to or Request Additional Jury Instruction | 80 |
|   |   | c. | Wide Range of Conduct Considered Reasonable | 81 |
|   | 3. | Rule as Applied to Appellate Counsel | | 83 |
| B. | Application | | | 85 |
| X. | CONCLUSION | | | 86 |

## I.    Introduction

This *habeas corpus* petition raises issues of due process and double jeopardy raised by New York State's criminal procedure. Federal and New York State practice with respect to participation by a judge in the plea-sentencing phase of criminal cases is somewhat different. Under Rule 11(c) of the Federal Rules of Criminal Procedure "the court must not participate in [plea] discussions." Fed. R. Crim. P. 11(c). The New York practice is somewhat more flexible. New York courts may accept a plea of guilty with the agreement by the judge of a specified

sentence (as suggested by the district attorney), subject to reconsidering its terms—that is to say, the original proposed sentence is conditional upon the court's receiving additional information on defendant's background before the actual sentencing.

In the present case, this New York practice was followed. Petitioner and the district attorney arrived at a plea bargain approved by the court conditionally. The court then received new information indicating that the defendant was more dangerous than it previously thought, and required a much longer sentence of incarceration.

Following the state practice, petitioner was offered a harsher sentence if he continued to plead guilty. When he refused this new deal, he was permitted to withdraw his plea and go to trial. He refused to accept the new plea sentence proposal, went to trial, was convicted, and received a sentence of incarceration much longer than the two previously offered. This state practice has been repeatedly approved by both state and federal courts.

Petitioner's request for release is rejected. There is no indication that he was denied due process. A certificate of appealability is granted so the Court of Appeals for the Second Circuit can revisit the New York practice, as applied in the present case, with a view to its constitutionality.

Petitioner, Emmanuel Constant—better known by some as the founder and former leader of a paramilitary Haitian death squad that operated under Haiti's 1991–1994 military regime (a history that plays a critical role in this case)—seeks a writ of *habeas corpus*. *See* 28 U.S.C. § 2254. He blames the trial court for his decision to go to trial. There is no merit to his claim.

Petitioner contends that he had accepted an offer of a one to three year term if he pled guilty to one count of grand larceny in the second degree with respect to fraudulent activity regarding a real estate transaction in Brooklyn. After hearing of defendant's misdeeds in Haiti,

4

the trial court upped the offer to a three to nine year term. Rejecting the offer, petitioner went to trial. He lost. He claims that the trial court improperly vacated his guilty plea, forcing him to stand trial for an offense to which he had already pled guilty.

Seven grounds for relief are asserted: (1) violation of due process arising from the court's *sua sponte vacatur* of his guilty plea; (2) entitlement to specific performance of the original plea agreement; (3) violation of the right to not be twice placed in jeopardy stemming from his being forced to stand trial for an offense to which he had already pled guilty; (4) violation of due process resulting from the introduction of third party documents affecting his sentencing; (5) a sentence based on improper and unsubstantiated claims; (6) an erroneous jury charge; and (7) ineffective assistance of trial and appellate counsel.

Petitioner's central issue, tying together claims 1–5 and part of 7, is: Did the trial court afford due process in *sua sponte* vacating petitioner's original guilty plea? The answer is yes. The independent claim 6 and the contentions in claim 7 regarding petitioner's trial and appellate representation also lack merit.

The petition is dismissed.

A certificate of appealability is granted on all but question 6. The issue of whether the court could, in effect, force the defendant to withdraw a plea so that it could impose a higher sentence than the one originally promised is somewhat troublesome in this case. Double jeopardy problems are implicated with respect to Count 3 of the indictment, to which petitioner pled guilty at his original plea allocation. It is not clear that the defendant understood that he could withdraw his plea and take the guarantee of the of three to nine year sentence offered. He may have been confused about whether he was going to trial on one count or six of the seven counts upon which he had been indicted. *See* Indictment, Oct. 24, 2006, ECF No. 20-1 at 2–6.

## II. Facts

### A. Crime of Conviction

#### 1. Mortgage Fraud Scheme

From 2001 to 2004, petitioner, who had immigrated from Haiti to the United States in 1994, organized a series of fraudulent real estate transactions. *See* Trial Transcript at 362:6–363:1, 441:19–442:24, 785:12–24, 832:18–833:3, *People v. Constant*, Kings Cnty. Indict. No. 8206-06 (N.Y. Crim. Ct.) July 14–25, 2008, ECF Nos. 20-3 at 1–683, 20-4 at 1–652, 31-1 at 1–2, 31-2 at 1–2, 31-3 at 1–5, 31-4 at 1–2, 31-5 at 1–2, 31-6 at 1 ("Trial Tr."). Accomplices, including loan officers, property appraisers, title closers, and settlement agents, facilitated the fraudulent deals. *Id.* at 779:13–15, 785:12–786:12 (loan officer function); *id.* at 258:10–261:15, 270:1–10, 302:14–20, 311:4–22, 692:23–693:12, 1072:16–1073:2, 1141:5–11 (involvement of coconspirator loan officers); *id.* at 755:5–756:3, 782:21–783:20 (property appraiser function); *id.* at 512:17–7, 685:24–686:17, 896:12–898:12, 984:6–24 (involvement of coconspirator property appraisers); *id.* at 619:9–13, 753:21–754:23 (title closer function); *id.* at 93:2–93:15, 634:7–11, 669:3–11, 753:21–754:23, 1105:25–1106:1 (involvement of coconspirator title closers); *id.* at 757:22–758:13 (settlement agent function); *id.* at 115:19–24, 263:9–22, 357:13–361:12, 367:9–14, 441:19–442:12, 556:10–16, 982:13–24, 1147:16–19, 1152:6–14 (involvement of coconspirator settlement agents); *see also* Trial Ex. 22 at 137–39, Mar. 16, 2006, ECF No. 20-7 at 26–178 (interview between petitioner and state investigators); Trial Ex. 23 at 95, Mar. 22, 2006, ECF No. 20-8 at 1–165 (same); Trial Ex. 32A at 103, Aug. 24, 2005, ECF No. 20-10 at 86–106 (recorded conversation between petitioner and coconspirator).

The transactions structured by petitioner are known as "ABC" schemes. "A" represents an innocent, legitimate seller of real property. "B" represents a criminal entity that purchases the property from "A" at its real worth. "C" represents a "straw buyer," recruited by scheme

6

participants for a nominal fee, whose financial stability is enormously exaggerated. Trial Tr. at 52:17–53:9, 60:25–61:7, 1065:2–1066:2. A careless or complicit bank is engaged.

- *First*, B agrees with A on a fair sale price and signs a contract to buy with a small deposit.

- *Second*, an appraisal seriously overinflating the value of the property is obtained from a cooperating appraiser.

- *Third*, unknown to A, B flips the property it has yet to own to C, a straw buyer, at a substantially inflated price, obtaining an overinflated bank mortgage loan in C's name.

- *Fourth*, B uses part of the fraudulently obtained mortgage loan money given by C to pay A, the former owner, the fair price of the property.

- *Fifth*, B divides the borrowed money that was not needed to pay A among the coconspirators.

- *Sixth*, C, the straw buyer, defaults on the loan. The bank is left holding a defaulted loan and an underwater property.

*Id.* at 51:20–55:6, 60:17–61:4, 64:16–66:20, 180:12–21, 259:9–13.

### 2. Jury Verdict

In July 2008, petitioner was convicted for his participation in mortgage fraud related to three different properties located in Kings County, New York: (1) 153 Hull Street; (2) 87 Monroe Street; and (3) 118 Bainbridge Street. *Id.* at 1071:8–1074:23, 1120:24–1136:6, 1147:2–1153:13, 1345:18–1346:5. A jury found him guilty on six counts, including one count of a scheme to defraud, one count of grand larceny in the third degree, two counts of grand larceny in the second degree, and two counts of falsifying business records. *Id.* at 1345:18–1346:5.

7

### 3. Sentence

On October 28, 2008, the court imposed an aggregate, indeterminate sentence of twelve and one-third to thirty-seven years of imprisonment. *See* October 28, 2008 Hearing Transcript 25:13–26:19, Oct. 28, 2008, ECF No. 20-4 at 653–79 ("Oct. 28, 2008 Hr'g Tr."). The sentence was automatically reduced to a ten to twenty year incarceratory term by operation of section 70.30(1)(e)(i) of New York's Penal Law, setting the minimum and maximum terms of imprisonment for aggregate consecutive sentences. *See* N.Y. Penal Law § 70.30(1)(e)(i).

## III.  Procedural History

### A. Plea Allocution

Petitioner was arraigned in New York State Supreme Court on November 9, 2006. *See* Arraignment Transcript, Nov. 9, 2006, ECF No. 20-2 at 2–4. He pled not guilty. *Id.* at 2:16–18.

Three months later, on February 6, 2007, he withdrew his initial "not guilty" plea and pled "guilty" to the charge of grand larceny in the second degree as it related to the 87 Monroe Street transaction. *See* Plea Hearing 2:9–15, Feb. 6, 2007, ECF No. 20-2 at 8–20. On the district attorney's motion, counts related to a 1559 Pacific Street were dismissed. *Id.* at 2:19–22. A term of incarceration of one to three years, to be served concurrently with a related matter pending before the criminal court in Suffolk County, where petitioner had also pled guilty, was recommended by the prosecutor. *Id.* at 2:23–3:12.

The court underscored that acceptance of the terms of the plea was subject to its discretion:

> Now, if the probation report reveals information previously unknown to the Court, that the Court [feels] is of a serious nature, *the Court, in its discretion, may refuse to sentence the Defendant under the plea terms*, and permit the Defendant to withdraw [his] plea.

*Id.* at 3:19–24 (emphasis added).

8

Emphasized were the rights that petitioner would be giving up by accepting a plea deal:

> **The Court**: Do you understand, if you did not take a plea, and you went to trial, you would have a right to a trial by jury, with the assistance of an attorney. Do you understand that?
>
> **The Defendant**: Yes.
>
> **The Court**: You will not have to testify and take the stand. Do you understand that?
>
> **The Defendant**: Yes.
>
> **The Court**: You would have a right to hear the witnesses testifying against you. Do you understand that?
>
> **The Defendant**: Yes.
>
> **The Court**: You would have the right to bring in witnesses to testify for you. Do you understand that?
>
> **The Defendant**: Yes.
>
> **The Court**: By pleading guilty, you give up those rights. Do you understand that?
>
> **The Defendant**: Yes.
>
> **The Court**: And, a plea of guilty is the same as a conviction after trial. Do you understand that?
>
> **The Defendant**: Yes, your honor.

*Id.* at 5:15–6:9. Petitioner's counsel explained to the court that there was "a possibility that Mr. Constant may continue to cooperate with the Attorney General's Office. And, if they obtain information they feel is useful, they may recommend a lesser time of incarceration." *Id.* at 7:11–15.

The court made it plain that the guilty plea would not be accepted unless defendant admitted his guilt. *Id.* at 7:18–21. Petitioner's admission of guilt was taken as follows:

> **[Prosecutor]**: The People contend, relating to count three of the

indictment, that on or about October 2, 2002, in Kings County, and other locations in the State of New York, the Defendant, acting in concert with other persons, helped process loan applications through a bank with respect to a property located at 878 [sic] Monroe Street in Brooklyn, New York. And, based on false representations that the Defendant and others knowingly made in those documents that were submitted to the bank, the bank, then relying on the documents, advanced mortgage money that it would not otherwise have advanced had it known the true circumstances of the transaction relating to that property, namely, 87 Monroe Street, Brooklyn, New York.

**The Court**: And the amount of money that was involved?

**[Prosecutor]**: It was in excess of $50,000.

**The Court**: Is that correct, sir?

**The Defendant**: Yes, your Honor.

*Id.* at 7:23–8:16.

Petitioner was advised of the maximum sentence available should he fail to cooperate before sentencing:

**The Court**: If you fail to appear for sentence, or [are] rearrested, you will not be permitted to withdraw this plea, and all promises are void. At that point, the court may impose any permissible sentence. What is the maximum?

**The Clerk**: Five to 15 years.

**The Court**: You can get five to 15 years on this case. Do you understand that?

**The Defendant**: Yes, your Honor.

*Id.* at 8:25–9:8.

Satisfied with petitioner's understanding of the nature of the charges, the plea, and the possible consequences of the plea, the court accepted the plea, stating:

The Court is satisfied that the Defendant understands the nature of

10

the charges, nature of the plea, and possible consequences of his plea.

The defendant has discussed his legal rights with his attorney. He is waving [sic] his constitutional rights. And, the plea is voluntary, of his own free will. And, that the Defendant admits his guilty [sic], and is willing to assume responsibility for it.

By pleading guilty, the Defendant is insured prompt and certain punishment to himself, without delay. And the Court believes it is in the interest of justice to take the plea from the Defendant.

The clerk is directed to take the plea.

*Id.* at 10:11–23.

> **The Clerk**: Do you now plead guilty to the crime of Grand Larceny in the Second Degree, a class C felony, in full satisfaction of the indictment. Is that what you wish to do?
>
> **The Defendant**: Yes.

*Id.* at 11:8–12.

Petitioner was told that he could not be sentenced prior to the court's receipt of a probation report.

> **[Defendant's Counsel]**: Your Honor, as far as the probation report that was completed out in Suffolk County. Will there be a separate probation report completed here? I would like that.
>
> **The Court**: I think the statute requires, this is a felony. That in order for me to sentence the Defendant I have to have a probation report.

*Id.* at 12:19–25.

Sentencing was set for April 16, 2007. *Id.* at 12:16–18. It was subsequently adjourned to May 15, 2007. *See* Adjournment Request Hearing, Apr. 16, 2007, ECF No. 20-2 at 21–22.

## B. Third Party Informs Court of Petitioner's Alleged Crimes in Haiti

On May 14, 2007, one day before petitioner's scheduled sentencing hearing, the court

received a letter from Jennifer Green of the Center for Constitutional Rights ("CCR"), a human

rights legal organization. *See* Letter from Jennifer Green, ECF No. 20-1 at 18–20 ("CCR

Letter"). The letter alleged in detail that petitioner was responsible for human rights abuses and

political violence in Haiti:

> On behalf of the Center for Constitutional Rights (CCR), a legal non-profit dedicated to upholding the rights in the U.S. Constitution and the Universal Declaration of Human Rights, I respectfully submit this letter to be considered as a part of the pre-sentencing report in the criminal matter involving defendant Emmanuel ("Toto") Constant.
>
> As the following information will show, Constant has a long history of human rights abuses in his home country of Haiti, in addition to the fraud he has committed while in the United States. We strongly encourage the Court to apply the maximum sentence under the law to Constant and also strongly encourage the judicial system of New York to take all possible measures so that Constant serves his sentence in its entirety before he faces deportation back to Haiti.
>
> As the former leader of the notorious Haitian paramilitary death squad known as FRAPH (the Revolutionary Front for Haitian Advancement and Progress), Constant was responsible for massacres, gang rapes and other torture committed by FRAPH under his command. FRAPH was formed in August or September of 1993 to assist the Haitian military in blocking the return to power of President Jean-Bertrand Aristide, whom the military had overthrown in a coup in 1991.
>
> After President Aristide returned to power, he issued an arrest warrant for Constant for his crimes committed during the time of military rule. Soon after, in December 1994, Constant then fled to the United States.
>
> In the late 1990s, the regional human rights body, the Organization of American States Inter-American Commission on Human Rights found that "[t]he primary instruments of the repression inflicted on women and children in Haiti have been rapes and other types of violence and abuse committed by members of the army and police forces, their armed civilian auxiliaries, the attachés, paramilitary groups and members of FRAPH, acting with complete impunity." Organization of American States, Report on the Situation of

Human Rights in Haiti, para. 119[.] The report continued,

> . . . [A]rmed men, frequently soldiers or FRAPH members, violently enter the house of a political militant to arrest him. When he is not there and the family cannot say where he is, the intruders turn against his wife, sister, daughter or cousin. Sexual abuse against Haitian women was carried out in various ways, but with a single aim: to create a climate of terror among people supporting Aristide. Women were generally raped by several men on the same occasion. Pregnant women and those who had just given birth were not safe from these crimes. Often, a violation occurred in the home of the victim in front of children and other family members, and then not only the woman, but the entire family was terrorized." *Id.* paras. 121-122.

In 2004, the Center for Constitutional Rights, along with co-counsel from the Center for Justice and Accountability, filed a civil lawsuit against Constant charging him with crimes against humanity, attempted summary execution, and rape and other torture on behalf of three Haitian women who were brutally tortured by FRAPH. Two of the three plaintiffs were gang-raped in front of their families. A third was attacked by two FRAPH operatives and left for dead. Constant chose to simply ignore these charges, and in October 2006, the judge in the case issued a default judgment against Constant for his role in crimes against humanity, attempted summary execution, and rape and other torture. In awarding punitive damages, the Southern District of New York noted,

> Constant's conduct was clearly malicious. As commander of FRAPH, Constant founded and oversaw an organization that was dedicated principally towards terrorizing and torturing political opponents of the military regime. His direction or at a minimum, approval – of FRAPH's state-backed campaign of violence constitutes an inexcusable violation of international law and merits a stiff punishment. This is particularly so because given that the government of Haiti has not, and likely will not prosecute Constant for his actions, "the objective of the international law making torture punishable as a crime can only be vindicated by imposing punitive damages."

> *Doe v. Constant,* [04-CV-10108], Findings of Fact and Conclusions of Law, Oct. 24, 2006[,] Slip Op. at 12 (citations omitted). . . . .
>
> Constant's record of human rights abuses have been confirmed by U.S. government documents. In the mid-1990s, CCR obtained documents from the U.S. government through a series of Freedom of Information Act Requests which confirmed the broad and systematic pattern of FRAPH abuses and revealed that Constant directly conspired in the assassination of President Aristide's Minister of Justice, Guy Malary.
>
> The record of Constant's human rights abuses in Haiti is extensive and we respectfully urge this court to take this record into account in applying the maximum sentence to Mr. Constant for his crime of grand larceny and fraud.
>
> We also ask that Constant serve his full sentence in the U.S. before being deported to Haiti. With the instability that currently exists in Haiti, it is extremely likely that Mr. Constant would be able to evade justice once in his home country. A number of leaders of FRAPH escaped justice during the previous military regime. Given Constant's documented pattern of human rights abuses perpetrated upon the Haitian people, he represents a serious threat to the safety and well-being of the nation. Serving his sentence in the United States would allow the Haitian justice system a chance to stabilize, so there is a greater chance for human rights abusers such as Constant to be brought to justice, rather than remain at large and able to perpetrate further human rights abuses.

*Id.*; *see also generally Report on the Situation of Human Rights in Haiti*, Organization of American States (Feb. 9, 1995), ECF No. 20-1 at 22–35 (excerpt). *But see* Memorandum in Defense of Emmanuel Constant Against the Allegations of Human Rights Violations, Oct. 28, 2008, ECF No. 21 at 16–49 (*sealed*) (contesting the allegations set forth in CCR Letter and maintaining that he is not being afforded the opportunity to defend himself against such allegations appropriately).

### C. Post-Plea Sentencing

#### 1. First Hearing

##### a. Department of Homeland Security Requests Time Served

Petitioner's sentencing hearing was held on May 15, 2007. *See* May 15, 2007 Hearing

Transcript, May 15, 2007, ECF No. 20-2 at 23–47 ("May 15, 2007 Hr'g Tr."). After listening to

the state reiterate its support for the initial plea agreement, the court heard statements from two

United States Department of Homeland Security ("DHS") representatives, Paul Gleason and

Arjay Bhatt. *Id.* at 4:5–7, 4:18–19.

Gleason and Bhatt explained that Immigration and Customs Enforcement ("ICE") was

seeking custody of petitioner to expedite his deportation to Haiti because he had a previously un-

executed final order of removal against him, as well as an indictment *in absentia* in Haiti for

torture and murder in a 1994 massacre in Raboteau. *Id.* at 4:10–15, 5:19–24.

> Raboteau, a heavily-populated shanty town along the coast at Gonaïves, was particularly targeted for repression by the army and paramilitary because of its activist past and the strong support of its inhabitants for ousted president Aristide. As a result of a joint military and paramilitary operation which began on 18 April 1994, an estimated 20 people lost their lives. Homes were sacked and burned and men, women and children beaten. Some died from the beatings or from gunshot wounds while others drowned as they fled into the sea. Some bodies were never recovered, as the survivors had to flee the area for their own safety.

*Haiti: Perpetrators of Past Abuses Threaten Human Rights and the Reestablishment of the Rule*

*of Law*, Amnesty Int'l at A-104 at 264, Mar. 3, 2004, ECF No. 20-1 at 261–72.

The DHS representatives indicated that the justice system in Haiti had improved and was

capable of trying petitioner:

> [T]he government of Haiti has clearly demonstrated its capacity to seek justice for criminality since February, with the support of the United States, issues [sic] in Haiti, has captured, arrested and detained over 400 gang members whose judicial proceedings are

pending.

> Overall Haiti has made significant progress over the last two years.
> The people are operating freely and democratically, a new
> government parliament, and officials working with the Department
> of State closely and its ties in Haiti, to determine the future for
> Emmanuel Constant and respectfully request that he enter ICE
> custody.

*See* May 15, 2007 Hr'g Tr. 4:24–5:13.

DHS requested a sentence of "time served" to facilitate petitioner's deportation to Haiti.

*Id.* at 6:6–18.

### b. Center for Constitutional Rights Requests Lengthy Sentence

Jennifer Green, who had written the letter concerning petitioner's crimes in Haiti, also

spoke at the hearing. *Id.* at 8:15; CCR Letter, ECF No. 20-1 at 18–20. She countered the

suggestion that Haiti was capable of trying petitioner.

> We have heard from some of[] our colleagues in Haiti who have
> represented to us that the situation in Haiti is still one of chaos and
> that the justice system is still either [sic] being put back together
> after the latest military coup. The new democratic government has
> been in position for a very short time.

*See* May 15, 2007 Hr'g Tr. at 8:16–22. Arguing against sentencing petitioner to time served,

Green contended that he should receive a longer sentence than the one to three years

contemplated in the plea bargain.

> It will also just offend a lot of the members of the Haiti [sic]
> community if Mr. Constant were given time served. That means
> he would serve under the minimum for this crime and given the
> heinous nature of the other crimes he has committed, which we do
> think reflect very negatively on his character, we think it is
> offensive that he would be serving two months on a one to three
> year sentence. We think he should serve at least the minimum
> [sentence of five years].

*Id.* at 9:5–14.

### c. Decision Deferred

Deferring pronouncement of petitioner's sentence, the court indicated that it had underestimated the nature of defendant's prior bad acts and needed to reconsider the case:

> [I] must indicate that the charges that are being and they're only charges, are being alleged against this defendant are much more than what I anticipated had to do with accepting the plea and in my plea, in the plea allocution, I did say that if there is anything that comes to my attention, I would permit the defendant to withdraw his plea if I could not move ahead with the plea itself. If this defendant was convicted and he's innocent in this courtroom of any charges against him with reference to the charges that are brought, if in fact the Court permits him to withdraw his plea, he would be facing five to 15 years here in the United States on this matter if he's convicted. Up to. That doesn't mean the Court would give him that amount. It doesn't mean—I won't prejudge what I would do. But *I am not prepared at this point today to sentence the defendant or permit him to withdraw his plea.* I'm going to think about this. This has all been given to me in the last couple of minutes, and I think it's too important an issue for the Court merely to come to a conclusion without analyzing, and I would also give [CCR] an opportunity, anyone to give me any additional information that they want so I can make, I can evaluate this and come to a conclusion[.]

*Id.* at 11:12–12:14 (emphasis added).

The court explained that it would come to one of three possible conclusions:

> [First,] [i]t will either be agreeing with Homeland and give him time served so he can move ahead to wherever it is.
>
> [Second,] [i]t could be sentencing in the way I intended to sentence him, and we all intended to sentence him; that was one to three years and let the Parole Board do whatever they do[.]
>
> [O]r the third option, which is one that I am thinking about, is denying him the sentence and permitting him to withdraw his plea and asking the attorney general to try the case.

*Id.* at 12:15–25.

Reargument was scheduled for the following week. *Id.* at 13:4–6. Addressing the court, petitioner claimed that the issues raised by his indictment in Haiti had no bearing on his case

before the court, and that the allegations being brought against him by CCR were politically motivated.

> . . . I'm very surprised to be, like I said, surrounded suddenly by all types of allegations and accusations that, in fact, I have absolutely no bearing on the actual case that I'm, we are trying here. . . . [The] accusations . . . against me concern[] things that [are] purely political and happened in Haiti, that allegedly happened in Haiti[.]

*Id.* at 14:25–15:13. He continued:

> I've known for years that I have a final order of deportation even though the situation in Haiti is not really, is chaos for the time being and my life would be in danger if deported, but I'm willing to respect the order of the Homeland Security.

*Id.* at 16:4–9.

The court moved cautiously and with deliberation. It ordered all parties present at the hearing to share information regarding petitioner's sentencing:

> [T]he Court takes a lot of things into consideration when one takes a plea and a sentence, so the Court will evaluate everything that everybody is saying here and give everybody that opportunity to say everything. Everything is on the record. The defendant has an opportunity to say what he wants to say. . . . [A]fter he receives any additional information that he might receive[.]

*Id.* at 18:5–13, 18:18–20.

Petitioner's counsel indicated that the probation report in Suffolk County, where prisoner had been sentenced to a term of incarceration of one to three years for the crime of grand larceny in the second degree and other offenses for his involvement in mortgage fraud schemes contained the same allegations by CCR. *Id.* at 19:9–12; Letter from Assistant Deputy Attorney General, Nov. 9, 2006, ECF No. 20-1 at 14–16.

> I'd like to add, [the] Judge[] in the Suffolk County case did have a probation report and the probation report did point out all the accusations from the Center for Constitutional Rights.

May 15, 2007 Hr'g Tr. 19:8–12. The court indicated it needed to analyze the sentencing materials carefully.

> I find that the report that was given to me by the Center for Constitutional Rights, that is what I'm basing this upon, and I don't believe—and may I also say that two judges have a right to disagree with one another, like two lawyers have a right to disagree with one another. I might have looked at this quite differently with reference to a plea if I had this information in front of me. And I'm going to analyze it and see exactly what the decision will be[.]

*Id.* at 19:25–20:10.

## 2. Center for Constitutional Rights Submits Additional Documents

CCR then submitted declarations of three expert witnesses, Robert Maguire, Mario Joseph, and Brian Concannon, and additional documents regarding petitioner's crimes and the perilous state of the criminal justice system in Haiti. *See* Letter from Jennifer Green and Moira Feeney, May 18, 2007, ECF No. 20-1 at 55–57; *see also generally* ECF No. 20-1 at 59–290 (affidavits of experts and assorted documents, including: (1) 2007 report by the United States Agency for International Development detailing current problems in the Haitian judicial system; (2) 2007 annual report from the U.S. State Department Bureau of Democracy, Human Rights and Labor detailing ongoing problems in Haitian prison and detention centers; and (3) reports from Amnesty International and Human Rights Watch documenting human rights abusers and the continuing threat posed in Haiti).

The evidence showed that petitioner helped establish and led the Revolutionary Front for the Advancement and Progress of Haiti ("FRAPH"), a paramilitary force that supported the *de facto* military government that ruled Haiti from 1991 to 1994. *See* Decl. of Robert E. Maguire ¶¶ 3–4, 8–10, May 18, 2007, ECF No. 20-1 at 77–87 ("Maguire Decl."); Memorandum to the Congress of the United States of America by Emmanuel "Toto" Constant, Political Prisoner 89,

April 19, 1996, ECF No. 21 at 89–93 (*sealed*) (describing FRAPH's relationship with Clinton Administration in 1990s). "FRAPH," when pronounced, is a homophone for the Creole word "a sharp blow or punch." Maguire Decl. ¶ 4.

In 1991, FRAPH was initially led by a central committee of five self-appointed members, but three years later, petitioner had risen to Secretary General, "virtually the only active member of the committee." *Id.* at ¶ 13.

In his declaration, Maguire, an expert in Haitian politics and social history who had been visiting the country since 1979, explained petitioner's central role in FRAPH:

> Mr. Constant played a very large role in FRAPH. In my opinion, Mr. Constant created FRAPH, controlled FRAPH, and represented FRAPH. *My opinion is based on the assertions Mr. Constant made in a 1995 deposition* and from my own personal knowledge of Haiti during the early 1990s. *In his deposition, Mr. Constant admitted that he visited the headquarters of the organization, granted membership cards, named officials to departmental and regional branches, represented FRAPH before the press, called press conferences, attended FRAPH rallies, and made pronouncements on the radio and television. In his owns words, "I'm not a member of FRAPH. I'm a leader of FRAPH."*
>
> . . .
>
> . . . [Mr. Constant] was involved in the organization's day-to-day administrative activities. He was also involved in planning and carrying out major FRAPH activities. Two examples clearly illustrate this[:]
>
> [*First*,] [i]n October of 1993, a U.S. Navy vessel, the Harlan County, was to arrive in Haiti to deliver several hundred lightly armed Canadian and American troops who would act as police trainers, as agreed upon three months earlier at an internationally-brokered meeting at Governor's Island in New York between the de facto [Haitian] government and the legitimate exiled [Haitian] government. As the vessel approached Haiti, Mr. Constant personally called for a demonstration to prevent the troops from disembarking. Evidence of his influence emerged when international monitors verified that demonstrators sent by Mr. Constant to the docks in Port-au-Prince mimicked his stated talking points—namely that the fate of the police trainers aboard the Harlan County would be the same as that of US soldiers

recently killed and dragged through the streets of Mogadishu in Somalia. The subsequent withdrawal of the Harlan County boosted Mr. Constant's power and authority.

[Second], in late December of 1993, Mr. Constant coordinated and directed members of FRAPH to set fire to a large portion of Cite Soleil, a slum in Port-au-Prince . . . . Over 1,000 homes were burned and over 100 people died in this deliberate act of arson.

*Id.* at ¶¶ 17–18 (emphasis added); *see also* Deposition of Emmanuel Constant at 154:13–15, June 7, 1995, ECF No. 20-1 at 154–57 (excerpt) ("No, I was not the only FRAPH member. I was the—one of the FRAPH leaders. I'm not a member of FRAPH. I'm a leader of FRAPH.").

Maguire described some of the gruesome practices FRAPH used, including "scraping off a murder victim's face using a machete" and "rape." Maguire Decl. ¶¶ 19–20. His declaration stated:

. . . FRAPH routinely intimidated the population and tried to eliminate Mr. Aristide's supporters. Typically, FRAPH targeted known pro-democracy activists. And, if those activists had gone into hiding, FRAPH moved against family members of their intended target. According to reports of the National Truth and Justice Commission and reports by human rights observers, FRAPH would routinely murder, rape, torture, imprison, and kidnap activists opposed to the de facto government. FRAPH would also use specific techniques, such as "kout marasa" which involved simultaneously striking a victim's ears[,] which pierced the victim's eardrums, [and] caused profuse bleeding and permanent damage to that person's hearing. It also engaged in the particularly gruesome practice of "erasing," which involved scraping off a murder victim's face using a machete[,] to literally erase it. [The] [e]rasing technique was particularly horrifying in the context of Haiti's deeply spiritual society where it is very important to ensure that loved ones find eternal rest after death[.] Because erasing removed the victim's identity, this ensured that the soul of the disfigured body would not find eternal rest. As a result, entire families were tormented and haunted by FRAPH's actions.

The incidence of politically-induced rape increased dramatically in late 1993 through 1994, when FRAPH was at its peak of power. Rape was used by FRAPH to accomplish a number of goals. If

FRAPH members went to the home of an activist who supported Aristide or who opposed the *de facto* government and discovered that the activist was not home, then the FRAPH members might rape the women and children who were there as surrogates of their intended victim. In other cases, FRAPH members raped women who were known . . . or suspected to be activists. Rape was used in both of these situations to instill fear[,] and to intimidate, shame, and silence the victim.

As a leader and organizer of FRAPH, Mr. Constant clearly knew of his organization's use of rape . . . as a tactic for terrorizing and silencing the population. Further, Mr. Constant, like all Haitian citizens at this time, would have been well-aware of the increasing incidence of rape being enacted by gangs of paramilitary operatives as a result of the publicity [the rapes] received via broadcast and written reports, and via Haiti's extremely effective word-of-mouth channels for the dissemination of information. Hence, even if Mr. Constant wished to ignore the information . . . he was exposed to from his official position in FRAPH, he would certainly have to [have] know[n] about it as a Haitian resident. Given his position of authority within FRAPH, [there is no doubt that] Mr. Constant . . . could have stopped the rapes and other abuses if he had chosen to.

*Id.* at ¶¶ 19–21.

Haitian human rights attorney Mario Joseph, in his declaration, listed the difficulties associated with bringing petitioner to trial in Haiti:

Based on my thirteen years' experience working with the Haitian justice system on prominent human rights cases, I believe there is a strong risk that the Haitian government will not adequately prosecute Mr. Constant if he is returned to Haiti because:

A. The Haitian justice system is historically weak, and was greatly weakened during the two years of the unelected Interim Government of Haiti or the "IGH" (March 2004–May 2006);

B. Several other people in Mr. Constant's exact legal situation are circulating freely in Haiti without being prosecuted . . . ;

C. High profile and complex human rights cases pose a challenge to Haiti's judicial system. The

> prosecution of the case of the Raboteau Massacre took more than four years. It finally went to trial six years after the return of democratic rule to Haiti.
>
> D. While in power, the IGH forced honest and objective judges off the bench, replacing them with their partisans. The most extreme example came with the firing of all the members of Haiti's highest court, the Cour de Cassation, in one fell swoop in December 2005. This maneuver had a strong impact on lower court judges, undermining their ability to remain impartial and objective. The judges and prosecutors appointed during the unconstitutional period of transitional government under the IGH remain on the bench.

*See* Declaration of Mario Joseph ¶ 7, May 18, 2007, ECF No. 20-1 at 59–64 ("Joseph Decl.");

*see also generally* Declaration of Brian E. Concannon, Jr., Esq., May 18, 2007, ECF No. 20-1 at 67–75 ("Concannon Decl.") (same).

Joseph stressed that other individuals indicted for the Raboteau Massacre had evaded justice:

> Another person convicted along with Mr. Constant in the Raboteau case is the number-two-in-command of FRAPH, Louis Jodel Chamblain. Mr. Chamblain took refuge in the Dominican Republic for many years. He was a leader in the armed invasion into Haiti that led to the coup d'etat of February 2004. Under international pressure, Mr. Chamblain turned himself in to the IGH, ostensibly to stand trial on another *in absentia* murder conviction. But the "trial" in August 2004 was a transparent device to free Mr. Chamblain. There were several procedural irregularities. Amnesty International referred to the trial as "an insult to justice" and a "mockery." The *New York Times* called it **"sham** justice." Mr. Chamblain was released, and has not been pursued for any of his crimes. He even ran for Parliament in the February 2006 elections.

Joseph Decl. at ¶ 11 (emphasis in original).

The weakness of Haiti's criminal justice system was corroborated by the declaration of Concannon, another human rights attorney:

The Raboteau case is a strong example of the politicization of the justice system under the IGH. There were two types of convictions at the trial: 1) the sixteen defendants who were in the courtroom, who, after a full defense, were convicted by a jury and sentenced by the judge; and 2) thirty-seven defendants convicted and sentenced *in absentia,* by a judge. *In absentia* defendants do not have the right to present a defense, but are allowed a re-trial, with no presumptions from the *in absentia* conviction, if they return to Haiti.

The in-court convicts in the Raboteau case appealed shortly after the November 2000 jury decision. At the time, the prosecutors and lawyers for the victims felt that the grounds they advanced were weak. But as time passed without the *Cour de Cassation,* Haiti's supreme court, deciding the appeal, we became worried. We initially feared that the convicts' rights were being denied, but after our repeated, unsuccessful efforts to convince the court to hear the appeal, we began to fear that the appeals were being delayed until the next coup d'etat, when the convicts could escape.

Those fears now appear well-justified. The *Cour de Cassation* never heard the appeal for three years. After the February 29 coup d'etat, the Court's President was installed as President of the country. By March 1, 2004, every person in jail for Raboteau had escaped. Subsequently, the IGH's judiciary dismantled the Raboteau decision.

. . .

Because the Haitian justice system is weak and compromised, and still has a long way to go to successfully transition from the compromises to its integrity and independence imposed by the IGH, I believe that the system would struggle to effectively prosecute any high profile complex human rights case right now. The fact that other people convicted, like Mr. Constant, *in absentia* in the Raboteau massacre case have not been pursued by the justice system makes me believe it is particularly unlikely that Mr. Constant will receive the kind of trial that his victims deserve.

Concannon Decl. ¶¶ 22–24, 30 (emphasis in original).

Both Joseph and Concannon argued that the Haitian political system needed time to

mature in order to handle petitioner's trial.

The more time that the Haitian government has to stabilize and reinforce our democratic institutions, the better chance that the judicial system will be capable of handling the complex case that

> Mr. Constant represents.

Joseph Decl. ¶ 13.

> . . . I believe an effective prosecution will be much more likely if the Haitian justice system is given time to rebuild itself.

Concannon Decl. ¶ 31.

### 3. Second Hearing

A second sentencing hearing was conducted. *See* May 21, 2007 Hearing Transcript, ECF No. 20-2 at 48–66. The court stated that it was in the process of reviewing the large number of documents that had been submitted regarding petitioner's alleged human rights abuses in Haiti. *Id.* at 5:12–16.

> I have no question at this point because I received so many documents. I read part of them. I haven't read them all. They are still coming in.

*Id.*

Green gave a brief overview of the substance of the additional documents submitted to the court a few days earlier, including the current incapacity of Haiti's judicial system to prosecute petitioner. *Id.* at 7:8–8:3. She introduced Joseph, who engaged in the following exchange:

> **Joseph:** The courts in Haiti up until now failed. One of the reasons I say this is because th[ere] is [a] guy who is number two after Emmanuel Constant [] who had the same accusations against him as Emmanuel Constant. And even though there was trial of him in Haiti he is now free in the streets.
>
> And the other thing is that the prisons in Haiti, there's no security there. Several times there's been breakouts.
>
> **The Court:** Was that person convicted or the case still pending? Was this a trial?
>
> **Joseph:** There was no judgment made on them. They—during the

middle of the night [had] all charges against them [removed]. The system is corrupt and there was a lot of weakness. In prison on many occasions the prisoners escaped. We have three people, a former general who was convicted in the same trial as Mr. Constant was tried. They were imprisoned. They were in jail in Haiti, and in February 2004 they escaped and got out. Many times there's rumors of escapes from jail in Haiti.

I am one of the first people who would call for Emmanuel Constant [] to go back to stand trial in Haiti. There are many victims in Haiti who would like to see him tried there, but the situation of justice and prisons in Haiti doesn't make it propitious for him to be returned right now.

*Id.* at 9:4–10:15.

Vigorously contesting the allegations against him and contending that he faced death if

he returned to Haiti, petitioner addressed the court:

. . . I've never ordered or promoted no violence. I never even assisted to nobody execution in my life. I was not brought up like that. All those accusation because I became a pawn in the whole situation because I was the most vocal. I was just fighting for the rights of my people on the embargo, but due to all the circumstances that we cannot discuss here, due to certain—my relationship with the U.S. government, with the White House, I was used as a scape goat, but I tell you my—I was promoting reconciliation between all the political parties. I have no, never promoted violence. There is no proof whatsoever, Your Honor, anywhere in the world that can link me to any type of massacre, execution, kidnapping, rape or anything of this sort.

I never had my day in court because everybody knows that if I ever go back to Haiti the actual government that's especially in power is still the same government that's still related to the Aristide government. Everybody knows in the world if I ever touch Haiti it's not the prison I am going to be escaping. I will be executed at the airport. Everybody knows it.

*Id.* at 12:8–13:12.

Decision was deferred until the following day. *Id.* at 17:16–18.

### 4. Guilty Plea Vacated

On May 22, citing the compendium of information it had received, the court explained

why it was refusing to accept the original plea bargain of one to three years offered to defendant

in exchange for his plea of guilty. *See* May 22, 2007 Hearing Transcript 7:4–6, ECF No. 20-2 at

67–76.

> The defendant had pleaded guilty before this court on February 6,
> 2007 and the matter is now on for sentence. What has been a
> simple imposition of sentence based on a negotiated plea has now
> turned into something far more complex. Under consideration by
> the court is vacatur of the plea, imposition of an agreed upon
> sentence, or a reduction of the sentence [to] time served resulting
> in an immediate deportation.
>
> In addition to the parties[,] the court has heard from representatives
> of the United States Department of State, the Department of
> Homeland Security, the Center for Constitutional Rights and also
> received hundreds of faxes from various individuals. All
> submissions have been made available to both the defense attorney
> and the Attorney General's office.
>
> Facts. Defendant pleaded guilty to charges relating to a mortgage
> fraud scheme. *During the plea colloquy[,] the court specifically
> provided that it may refuse to sentence the defendant if any
> information of a serious nature, previously unknown to the court,
> was revealed.* . . . The court went on to state that in such
> circumstances the defendant would be permitted to withdraw his
> plea.
>
> It is beyond dispute that, in addition to the information contained
> in the pre-sentence report detailing defendant's alleged crimes in
> Haiti the court has also recently received very detailed information
> regarding these crimes and the defendant's leadership role in a
> Haitian anti-democracy paramilitary organization, the
> Revolutionary Front for the Advancement and Progress of Haiti
> (known as F.R.A.P.H.). These allegations included in [sic]
> F.R.A.P.H. involvement in rape, murder, and intimidation of
> Haitian people on a large scale. F.R.A.P.H. members brutally
> attempted to crush the democracy movement in Haiti.
>
> "Conditions agreed upon as part of a plea bargain are generally
> enforceable, unless violative of statute or public policy." That's

> *People versus Hicks*, 98 NY2d 185, 207. However *a sentencing
> promise made with "a plea is conditioned upon its being lawful
> and appropriate in light of the subsequent pre-sentence report or
> information* obtained from other reliable sources." Citing *People
> versus Selikoff*, 35 NY 227, 238. It is well accepted that if a plea
> agreement cannot be fulfilled the court should vacate the guilty
> plea. That's *Selikoff* at 241; *People versus Escalona*, 2001 WL
> 880830 and that's supreme court, Kings county 2001.
>
> The extent and specificity of the evidence regarding the
> defendant's involvement and leadership role in [] F.R.A.P.H. has
> only been recently submitted to the Court[;] while defendant
> deserves the opportunity to defend himself against these charges
> and is presumed innocent, *it is apparent that he was involved with
> F.R.A.P.H and played a key role*. On June 7, 1995 defendant was
> deposed for a federal case against F.R.A.P.H and stated "I'm not a
> member of FRAPH. I'm not a member of FRAPH. I'm a leader of
> FRAPH."
>
> These allegations, if true, are heinous, and the court cannot in good
> conscience consent to the previously negotiated sentence. The
> court also [cannot] consent to the time served, as that would be a
> travesty. *The plea is hereby vacated and all counts of the
> indictment reinstated.*

*Id.* at 3:21–7:6 (emphasis added).

Petitioner's counsel contested the court's *vacatur*:

> For the record[,] I want to add that the court was fully aware of Mr.
> Constant's background. All the documents are in the court file.
> The documents that I gave you yesterday, Judge, clearly give good
> background on his history in Haiti and for the court to say there's
> new information that wasn't made aware and for this plea to be
> vacated based on that is a misuse of discretion and I do intend to
> appeal.

*Id.* at 8:24–9:9.

Responding, the court noted: "While some information was available [as] stated in the

decision[,] much more detail[ed] and highly specific information [about Mr. Constant] was only

provided within the last week and indeed the last few days." *Id.* at 9:11–15.

## 5. Third Hearing

### a. Petitioner Offered Revised Plea Deal

Five months later, at a status conference held on October 31, 2007, the court indicated that it would be amenable to a plea agreement of an incarceratory sentence of three to nine years:

> [T]he Attorney General had recommended a plea of one to three years.
>
> And the plea was taken to the Court, and then *the Court would not accept the plea after we received all the notices and so forth.*
>
> I had suggested today, to resolve this issue, that the Court would accept a plea of [three] to [nine] years.

*See* Transcript of October 31, 2007 Hearing 2:14–20, ECF No. 20-2 at 80–86 (emphasis added). If the case were to proceed to trial, the court indicated that petitioner could face up to forty-five years in prison. *Id.* at 2:21–3:3. The court gave petitioner until November 29, 2007 to decide if he would accept this revised plea deal. *Id.* at 5:13–14, 6:14.

At the hearing, petitioner's counsel indicated that he would be making an application to be relieved from the case due to "irreconcilable differences in the way the case [was] being handled." *Id.* at 3:16–20.

### b. Revised Plea Deal Rejected by Petitioner

One month after an enhanced sentence was offered, petitioner rejected it. *See* Transcript of November 29, 2007 Hearing 4:22–5:2, ECF No. 20-2 at 87–105. Asking the court to re-instate the original plea, petitioner explained that he had agreed to the initial plea bargain because it would run concurrently with the sentence in Suffolk County, which would allow him to be released earlier. *Id.* at 11:6–10, 13:7–21.

> **The Court:** What you're saying to me, and let's be very frank. Maybe you are having difficulty expressing it, but you want me to reduce the amount of time that I made as an offer; is that what you're saying?

> **The Defendant:** If it's possible because I want to be entitled to the plea that we had before.

> **The Court:** I already said that I am not going to honor that plea.

*Id.* at 15:1–10. Having granted the application to relieve petitioner's prior counsel, the court

adjourned sentencing so that petitioner could obtain and consult with new counsel. *Id.* at 18:13–

24.

### c. Revised Plea Deal Again Rejected by Petitioner

On January 9, 2008, two months after the court had extended its offer of an enhanced

sentence, petitioner, now represented by a new attorney, again rejected the revised plea deal. *See*

Transcript of January 9, 2008 Hearing 2:4–12, ECF No. 20-2 at 109–12.

> **[Petitioner's Counsel]:** I have had extensive conversations with my client. For the last two weeks he was incarcerated in Downstate prison and I was able to speak with him. Based on our conversations both then and this morning he has informed me that he does not wish to take this Court's plea offer.

*Id.* at 2:7–12.

The offer was retracted:

> **The Court:** That's fine. I want him to be aware that it is off the table.

*Id.* at 2:13–14.

### D. Trial

#### 1. Case Presented to Jury

Petitioner's trial lasted ten days. The prosecution called seventeen witnesses, including

key coconspirators of petitioner involved in three fraudulent real estate transactions. Petitioner

essentially justified his actions in two of the three transactions on the ground of good faith and

denied his involvement in the third. Trial Tr. 1027:16–1188:18, 1208:24–1209:11, 1243:3–

1244:7, 1253:8–1258:17.

Defendant's counsel did what he could with a poor factual defense.

- Petitioner's unlawful involvement in the 153 Hull Street conveyance was proved by a preponderance of the evidence. *Id.* at 45:2–16, 51:2–56:13, 76:15–23, 258:10–260:24, 925:5–8, 966:17–968:25, 1058:22–25 (loan officer's role); *id.* 233:6–235:4, 240:3–242:3, 246:12–17 (straw buyer's role); Trial Ex. 3B at 22, Feb. 8, 2002, ECF No. 20-5 at 21–24 (loan application); Trial Tr. 105:10–108:6, 834:11–13, Trial Ex. 6 at 34, Jan. 29, 2002, ECF No. 20-5 at 31–34 (fraudulent appraisal); Trial Tr. 102:3–105:5, 236:5–14, 241:15–17, 861:21–862:2, 915:22–916:5, 925:19–926:7 (exchange of illicit funds).

- His illegal participation in the 87 Monroe Street transaction was sufficiently established. *Id.* at 396:19–397:5, 527:22–548:18, 845:8–13, 943:20–947:23, 1141:4–9 (role of coconspirators in loan application, title transfer, and property appraisal); Trial Ex. 13, Oct. 3, 2003, ECF No. 20-6 at 22–35 (fraudulent appraisal); Trial Ex. 14, Dec. 31, 2003, ECF No. 20-6 at 36–39 (loan application); Trial Tr. 367:5–379:15, 540:14–546:8, 845:8–13, 944:25–945:19, Trial Ex. 15 at 41, Jan. 5, 2003, ECF No. 20-6 at 41–48, Trial Ex. 21, Jan. 8, 2004, ECF No. 20-7 at 24, Exs. 15, 16A, 16B, ECF No. 20-6 at 41–51 (check and debit statements tracking illicit funds).

- The role he executed in the 118 Bainbridge refinancing was sustained by the evidence. *See* Trial Tr. 675:17–684:16, 721:10–722:2 (petitioner's participation sought out to save ABC mortgage fraud scheme gone awry); *id.* at 686:18–696:12, 733:1–9, 739:13–24 (transfer of title and resale of loan); *id.* at 436:3–6,

31

439:1–20, 451:21–453:20, 702:10–24, 793:20–25, 795:7–14 (refinancing and payout to coconspirators);Trial Ex. 17 at 54, Dec. 20, 2004, ECF No. 20-6 at 53–56 (refinancing application); Trial Ex. 18 at 7, Oct. 9, 2004, ECF No. 20-7 at 2–18 (fraudulent appraisal); Trial Ex. 20, Dec. 30, 2004, ECF No. 20-7 at 22, Trial Ex. 29B, ECF No. 20-10 at 80 (exchange of illicit funds).

The jury decided on the flood of the state's inculpatory evidence that defendant was guilty of mortgage fraud.

### 2. Jury Instructions

The trial court instructed the jury in detail.

#### a. Scheme to Defraud

It read the following instruction regarding Count 1, a scheme to defraud:

> Under our law a person is guilty of a Scheme to Defraud in the First Degree when that person engages in a scheme instituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain properties from more than one person by false, or fraudulent pretenses, representations or promises and so obtains property with a value in excess of $1,000 from one or more such persons.

> It is necessary to prove the identity of at least one person from whom the defendant so obtained property, but it is not necessary to prove the identity of another intended victim.

Trial Tr. 1325:12–23.

The language of the statute in effect at the time read in relevant part:

> A person is guilty of a scheme to defraud in the first degree when he or she . . . engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtains property with a value in excess of one thousand dollars from one or more such persons . . . .

> In any prosecution under this section, it shall be necessary to prove

the identity of at least one person from whom the defendant so obtained property, but it shall not be necessary to prove the identity of any other intended victim . . . .

Scheme to defraud in the first degree is a class E felony.

N.Y. Penal Law § 190.65 (2008). "For a class E felony, the term shall be fixed by the court, and shall not exceed four years." N.Y. Penal Law § 70.00(2)(e) (2008).

### b. Grand Larceny in the Third Degree

The following instruction was read to the jury with respect to the second count, grand larceny in the third degree:

> [U]nder our law a person is guilty of Grand Larceny in the Third Degree when that person by acting in concert with another person or persons steals property, and when the value exceeds $3,000, a person steals property and commits larceny with the intent to deprive another person of property [or] to appropriate the same to himself or herself or to a third person, such person wrongfully takes[,] obtains or withholds such property from the owner of the property.

Trial Tr. 1327:13–20.

The grand larceny in the third degree statute at the time read: "A person is guilty . . . when he steals property and when the value of the property exceeds three thousand dollars." N.Y. Penal Law § 155.35 (2008). "Grand larceny in the third degree is a class D felony." *Id.* "For a class D felony, the term shall be fixed by the court, and shall not exceed seven years." N.Y. Penal Law § 70.00(2)(d) (2008).

### c. Grand Larceny in the Second Degree

Regarding grand larceny in the second degree, Counts 3 and 5 stated:

> [U]nder our law a person is guilty of Grand Larceny in the Second Degree when that person by acting in concert with another person or persons, steals property and when the value exceeded $ 50,000, a person steals property and commits Larceny when with the intent to deprive another of property or to appropriate the same to himself or a third person, such person wrongfully withholds the property,

33

from an owner of the property . . . .

Trial Tr. 1330:12–21.

The applicable section of the New York statute prompted that "[a] person is guilty of grand larceny in the second degree when he steals property and when . . . [t]he value of the property exceeds fifty thousand dollars . . . ." N.Y. Penal Law § 155.40 (2008). "Grand larceny in the second degree is a class C felony." *Id.* "For a class C felony, the term shall be fixed by the court, and shall not exceed fifteen years." N.Y. Penal Law § 70.00(2)(c) (2008).

### d. Falsifying Business Records in the First Degree

Falsifying business records in the first degree, Counts 4 and 6, was explained as follows:

> Falsifying Business Records in the First Degree when with the intent to defraud [], that includes an intent to commit another crime or to aid or conceal the commission there had of that person makes or causes a false entry in the business records of an enterprise, a true entry in the business records have had an enterprise in violation of a duty to do so which he or she knows to be as opposed [sic] upon him or her in the law, or by the nature of his or her testimony, the making of a new entry or causes the omission in a business record of an enterprise.

Trial Tr. 1333:11–21.

The New York statute for falsifying business records in the first and second degrees stated:

> A person is guilty of falsifying business records in the first degree when he commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof.
>
> Falsifying business records in the first degree is a class E felony.

N.Y. Penal Law § 175.10 (2008). "For a class E felony, the term shall be fixed by the court, and shall not exceed four years." N.Y. Penal Law § 70.00(2)(e) (2008).

> A person is guilty of falsifying business records in the second degree when, with intent to defraud, he:

1. Makes or causes a false entry in the business records of an enterprise; or

2. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise;

3. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or

4. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

N.Y. Penal Law § 175.05 (2008).

### 3. Deliberations and Verdict

Deliberations were completed in less than one day. *See* Trial Tr. 1305:3–1344:23. On July 25, 2008, the jury returned with a verdict convicting petitioner on all six counts.

### E. Post-Conviction Sentencing

The court sentenced petitioner to an indeterminate term of incarceration of twelve and one-third to thirty-seven years. Oct. 28, 2008 Hr'g Tr. 25:13–26:19. It noted defendant's lack of remorse, the seriousness of the offense, and his full participation as well as his "heinous" activities in Haiti.

> The defendant, of course, has a right to proceed to trial . . . and I am in no way penalizing the defendant for his decision to avail himself of a right that is guaranteed by our Constitution. So I am not taking into consideration the fact the defendant went to trial. He has that right and he exercised that right. But what is interesting to me is even right now is that the fact that there is no remorse on the defendant with reference to the case that is before us.
>
> After a jury trial, the defendant stands before this court convicted of a scheme to defraud in the first degree, grand larceny in the third degree, two counts of grand larceny in the second degree, and two counts of falsifying business records in the first degree. The court has considered all the reports and letters submitted by the parties,

35

reviewed the extensive court file, probation report, the amicus curiae brief. Having presided, by the way, over this trial, this court is fully fully familiar with the intricacies of this complex case. Defendant was one of the participants in a wide ranging mortgage fraud scheme that defrauded lenders of well over $1 million. Defendant and co-defendants engaged in [an] elaborate fraud that included the use of straw-buyers, falsification of key portions of the loan documentation required by law, false appraisals, inflated income figures for the buyers. All this fabricated information was used to falsely inflate a property's value so a lending institution would lend an amount of money in excess of the property's worth. The defendant and his confederates would then split the profit.

Defendant was a full and active participant in this scheme. Testimony, including his own, directly implicated him as a knowing participant in these illegal activities. This case, while serious in and of itself, takes an added resonance given the current global financial crisis. While the defendant and his confederates cannot be held accountable for the nationwide economic meltdown and the foreclosure crisis, this scheme, and others like it, have played a role in the situation. Mortgage fraud is not is not a victimless crime. All citizens and taxpayers are victims of this crime.

Falsely inflated real estate prices impact our communities by distorting the market. And for most Americans, their home is their most significant asset.

Defendant, a native of Haiti, has a truly heinous record of violence, murder, torture, intimidation under the brutal regime of the Duvaliers.

After fleeing Haiti, defendant arrived in this country and embarked on a further life of crime. Furthermore, defendant's participation in the mortgage fraud scheme before the court is not an isolated incident, he was also involved in another similar mortgage fraud scheme in Suffolk County here in New York. Defendant must be held accountable for his illegal actions. It is evident that he would [have] continued to flout the law if given the opportunity.

Sentencing of the defendant involves a sensitive balance of many factors including facts of the crime, particular circumstances of the offender, and the rehabilitative and deterrent aspects of incarceration based on this defendant's prior record.
. . .

Now, given the uncertainty of the political situation in Haiti and

the very real chance that this defendant may be able to evade justice due to the instability of the Haitian judicial system, it is the court's hope the defendant remain in New York State for the full term of his incarceration although it's probably apparent that the federal authorities may move to deport him shortly.

*Id.* at 22:20–27:2.

Throughout all sentencing proceedings at the trial court level, petitioner offered no affirmative evidence countering allegations regarding his involvement in human rights abuses in Haiti. The trial court's explanation of its decision was extensive and reflected serious consideration of the sentence imposed. *See* Abraham Gerges, J., Written Statement of Reasons, *People v. Constant*, Kings Cnty. Indict. No. 8206-06 (N.Y. Crim. Ct.) Oct. 28, 2008.

### F. Motion to Set Aside Sentence

In February 2009, petitioner moved before the trial court to set aside his sentence. *See* N.Y. Crim. Proc. Law § 440.20; Notice of Motion to Set Aside Sentence, Feb. 21, 2009, ECF No. 20-12 at 2–3. He argued that the calculation of his sentence was inaccurate and excessive. *See* Aff. in Supp. of C.P.L. § 440.20 Mot. to Set Aside Sentence, Feb. 21, 2009, ECF No. 20-12 at 4–9. He claimed that the trial court relied on "erroneous information" about petitioner's past activities in Haiti and was imposing an unnecessarily harsh sentence to punish petitioner for exercising his right to a jury trial. *Id.* at 8; *see also* Letter from Emmanuel Constant, October 16, 2008, ECF No. 21 at 9–13 (*sealed* but unsealed as to quote in parentheses) (defendant maintaining his sentence was improperly based on allegations unrelated to mortgage fraud scheme participation, attempting to clarify "false accusations" contained in CCR documents).

The court denied petitioner's motion. *See* Memorandum & Order, Feb. 22, 2010, ECF No. 20-12 at 89–92. It explained that consecutive sentences were appropriate in light of the fact that defendant participated in multiple factually distinct fraudulent transactions. *Id.* at 3–4. As

37

to petitioner's remaining claims—that the sentence was excessive and improperly factored in allegations about petitioner's past activities in Haiti—the court stated that they were "without merit." *Id.* at 4.

In March 2010, petitioner sought leave to appeal the denial of his motion to set aside his sentence, and to consolidate the action with his then-pending direct appeal of his conviction. *See* Notice of Motion for Leave to Appeal Pursuant to C.P.L. §§ 450.15, 460.15, Mar. 18, 2010, ECF No. 20-12 at 94–95. This application was denied. *See* Decision and Order on Application, Sept. 3, 2010, ECF No. 20-12 at 135.

### G. Direct Appeals

In January 2009, petitioner was granted leave to appeal his conviction to the Appellate Division of the New York Supreme Court. *See* Notice of Motion for Leave to Appeal Pursuant to C.P.L. §§ 450.15, 460.15, *People v. Constant*, No. 2010-03223 (N.Y. App. Div. 2d Dep't Mar. 18, 2010), ECF No. 20-12 at 95.

On appeal, petitioner claimed: *first*, that the court improperly vacated his plea; and, *second*, that the sentence imposed was excessive in light of the original plea bargain. *See* Brief for Defendant-Appellant 23–35, *People v. Constant*, 947 N.Y.S.2d 155, No. 2008-10007 (App. Div. 2d Dep't 2012), ECF No. 20 at 12–48. In supplemental *pro se* briefing, he argued: (1) that the *vacatur* of his plea had subjected him to double jeopardy; (2) that his trial counsel was ineffective; (3) that the jury charge was defective; and (4) that the verdict was against the weight of the evidence. *See* Appellant Pro Se Supplemental Brief for Defendant-Appellant 15–63, ECF No. 20 at 140–187.

In June 2012, the Appellate Division affirmed petitioner's conviction, rejecting all his arguments. *See People v. Constant*, 947 N.Y.S.2d 155, 156 (App. Div. 2d Dep't 2012). It had

considered the evidence.

The defendant's contention that the trial court lacked authority to vacate his plea of guilty and his contention in his pro se supplemental brief that the trial court forced him to go to trial against his will by vacating his plea of guilty are unpreserved for appellate review, as he did not object on those grounds before the trial court (*see* CPL 470.05[2]; *People v. Rosen*, 96 N.Y.2d 329, 335, 728 N.Y.S.2d 407, 752 N.E.2d 844, *cert. denied* 534 U.S. 899, 122 S. Ct. 224, 151 L.Ed.2d 160; *People v. Olmstead*, 77 A.D.3d 1179, 1181, 910 N.Y.S.2d 232). In any event, the contentions are without merit. *The record reveals that the defendant rejected the option of an enhanced sentence. Thus, under the circumstances, the trial court properly vacated his plea of guilty* (*see People v. Rubendall*, 4 A.D.3d 13, 17, 772 N.Y.S.2d 346; *People v. Davis*, 54 A.D.2d 410, 413, 389 N.Y.S.2d 94, *revd. on other grounds* 44 N.Y.2d 269, 405 N.Y.S.2d 428, 376 N.E.2d 901).

The defendant's contention in his pro se supplemental brief that he was entitled to specific performance of a plea agreement is not properly before this Court, since it is based upon matters dehors the record (*see People v. Walters*, 299 A.D.2d 377, 378, 749 N.Y.S.2d 156).

The *defendant's contentions raised in his pro se supplemental brief* that the trial court considered improper factors in refusing to impose the negotiated sentence pursuant to the plea deal and in vacating his plea are *unpreserved for appellate review* (*see* CPL 470.05[2]; *People v. Rosen*, 96 N.Y.2d at 335, 728 N.Y.S.2d 407, 752 N.E.2d 844; *People v. Aviles*, 87 A.D.3d 547, 548, 927 N.Y.S.2d 788). In any event, the contentions are *without merit* (*see* CPL 400.10 [1]; *Pepper v. United States* . . . , 131 S. Ct. 1229, 1239, 179 L.Ed.2d 196 [2011]; *People v. Hicks*, 98 N.Y.2d 185, 188, 746 N.Y.S.2d 441, 774 N.E.2d 205; *People v. Selikoff*, 35 N.Y.2d 227, 238, 360 N.Y.S.2d 623, 318 N.E.2d 784, *cert. denied* 419 U.S. 1122, 95 S. Ct. 806, 42 L.Ed.2d 822; *People v. Gray*, 51 A.D.3d 945, 856 N.Y.S.2d 887; *People v. Williams*, 195 A.D.2d 492, 493, 599 N.Y.S.2d 848).

The *defendant's contention that the trial court violated* his state statutory *right against double jeopardy* by vacating his plea of guilty is unpreserved for appellate review (*see* CPL 470.05[2]; *People v. Biggs*, 1 N.Y.3d 225, 231, 771 N.Y.S.2d 49, 803 N.E.2d 370, *cert. denied* 555 U.S. 1179, 129 S. Ct. 1326, 173 L.Ed.2d 599). In any event, the contention *is without merit* (*see People v.*

*Rodriguez*, 27 A.D.3d 585, 587, 811 N.Y.S.2d 752).

> The *defendant's contention in his pro se supplemental brief that the evidence was legally insufficient* to support his convictions is *unpreserved* for appellate review. In any event, viewing the evidence in the light most favorable to the prosecution (*see* CPL 470.05[2]; *People v. Hawkins*, 11 N.Y.3d 484, 492, 872 N.Y.S.2d 395, 900 N.E.2d 946), we find that *it was legally sufficient* to establish the defendant's guilt beyond a reasonable doubt (*see* Penal Law §§ 155.35, 155.40, 190.65; *People v. Romero*, 78 A.D.3d 740, 741, 909 N.Y.S.2d 911). Moreover, *in fulfilling our responsibility to conduct an independent review of the weight* of the evidence (*see* CPL 470.15 [5]; *People v. Danielson*, 9 N.Y.3d 342, 348, 849 N.Y.S.2d 480, 880 N.E.2d 1), we are *satisfied that the verdict of guilt was not against the weight of the evidence* (*see People v. Romero*, 7 N.Y.3d 633, 826 N.Y.S.2d 163, 859 N.E.2d 902).

> Contrary to the defendant's contention, *he was afforded the effective assistance of counsel.*

> The *sentence imposed was not excessive* (*see People v. Suitte*, 90 A.D.2d 80, 85–86, 455 N.Y.S.2d 675).

> The *defendant's remaining contentions*, raised in his *pro se* supplemental brief, *are without merit.*

*Id.* at 156–57 (emphasis added). Respondent's position that this court has no power to consider the double jeopardy issues because they were not preserved, as found by the Appellate Division, was rejected by this court for the reasons stated orally on the record. *See* Transcript of Hearing on *Habeas Corpus* Motion, Aug. 13, 2015 ("Aug. 13, 2015 Hr'g Tr.").

In July 2012, petitioner sought leave to appeal to the New York Court of Appeals. *See* Leave Application Letter, July 23, 2012, ECF No. 20-11 at 2–3. The application was denied without explanation on December 21, 2012. *See People v. Constant*, 982 N.E.2d 621 (N.Y. 2012).

No appeal was taken to the United States Supreme Court.

### H. Instant Petition

On March 20, 2014, petitioner filed a *pro se* petition for a writ of *habeas corpus* in this court, alleging the following: *first*, that the trial court's *vacatur* of the plea violated due process; *second*, that allowing CCR to testify at his sentencing violated due process; *third*, that petitioner was entitled to specific performance of the plea agreement; *fourth*, that petitioner was subjected to double jeopardy when a jury was empaneled after he had pled guilty; *fifth*, that he had ineffective assistance of trial counsel; *sixth*, that the jury instructions were faulty; and *seventh*, that the sentence imposed was impermissibly excessive. *See* 28 U.S.C. § 2254 Petition 5–22, ECF No. 1 at 15–36.

Counsel was appointed on October 17, 2014. *See* CJA 20 Appointment of and Authority to Pay Court Appointed Counsel, Oct. 17, 2014, ECF No. 26; *see also* Criminal Justice Act, 18 U.S.C. § 3006A.

## IV.     Applicable Standard of Review

### A.  Antiterrorism and Effective Death Penalty Act

Petitioner's *habeas* petition is governed by section 2254 of title 28 of the United States Code, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. A federal court may grant a writ of *habeas corpus* to a state prisoner on a claim that was "adjudicated on the merits" in state court *only* if it concludes that the adjudication of the claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

"An adjudication on the merits is a substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (citations omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (citation omitted); *see also Williams v. Taylor*, 529 U.S. 362, 380 (2000) (federal *habeas* courts deny relief if it "is contingent upon a rule of law not clearly established by United States Supreme Court precedent at the time the state court conviction became final").

"[W]hen deciding whether a state-court decision was 'contrary to' or an 'unreasonable application of . . . clearly established Federal law,' a federal habeas court will generally consider only those Supreme Court opinions issued prior to the state court's denial of relief." *Duhs v. Capra*, No. 13-CV-1056, 2015 WL 428321, at *15 (E.D.N.Y. Feb. 3, 2015) (citations omitted). "'But a Supreme Court decision issued after the relevant state court decision may be considered if it *illustrates* the proper application of a constitutional principle.'" *Id.* (emphasis in original) (citations omitted).

### 1. "Contrary to" Clause

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law *or* if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Taylor*, 529 U.S. at 412–13 (emphasis added); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002) (same).

### 2. "Unreasonable Application" Clause

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Taylor*, 529 U.S. at 413; *see also Bell*, 535 U.S. at 694 (same); *McMillon v. Culley*, 380 F. App'x 63, 64 (2d

42

Cir. 2010) (summary order) (same). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Taylor*, 529 U.S. at 411; *see also Duhs*, 2015 WL 428321 at *14; *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("application must be 'objectively unreasonable,' not merely wrong, even 'clear error' will not suffice").

"In determining whether a state court's application of Supreme Court precedent was unreasonable, a habeas court must be guided by the level of specificity of the relevant precedent's holding, because 'the range of reasonable judgment can depend in part on the nature of the relevant rule.'" *Contreras v. Artus*, 778 F.3d 97, 99 (2d Cir. 2015) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

> If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.

*Contreras*, 778 F.3d at 99.

### B. Deference to State Court

"Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (citations omitted). Relief is only merited to "guard against *extreme* malfunctions in the state criminal justice systems." *Greene v. Fisher*, 132 S.Ct. 38, 43 (2011) (emphasis added) (citations omitted).

A "federal habeas court may overturn a state court's application of federal law *only* if it is

so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Nevada v. Jackson*, 133 S.Ct. 1990, 1992 (2013) (per curiam) (emphasis added) (citations omitted). This "highly deferential standard" gives state-court decisions "the benefit of the doubt." *Hardy v. Cross*, 132 S.Ct. 490, 491 (2011) (per curiam) (citations omitted). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. "[W]e cannot grant habeas relief where a petitioner's claim pursuant to applicable federal law, or the U.S. Constitution, has been adjudicated on its merits in state court proceedings in a manner that is not manifestly contrary to common sense." *Santone v. Fisher*, 689 F.3d 138, 148 (2d Cir. 2012) (citations omitted).

State court findings of fact are entitled to great weight. *See* 28 U.S.C. § 2254(e)(1) (factual findings by state court may not be disturbed except upon a showing of "clear and convincing evidence"); *Smith v. Phillips*, 865 F. Supp. 2d 271, 278–79 (E.D.N.Y. 2012) (same), *aff'd sub nom. Smith v. Scully*, 588 F. App'x 16 (2d Cir. 2014) (summary order); *see also Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Burt v. Titlow*, 134 S.Ct. 10, 15 (2013) (same).

"It is well established that federal courts will not review questions of federal law presented in a habeas petition application when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citations omitted). "[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Id.* "[T]he adequacy of state procedural bars to the assertion of federal

questions is not within the State's prerogative finally to decide; rather, adequacy is itself a federal question." *Id.* (citations omitted). A federal court "ha[s] an independent duty to scrutinize the application of state rules that bar . . . review of federal claims." *Id.* at 468. "Where a petitioner has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised on habeas review only if the petitioner can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012) (citations omitted), *cert. denied*, 134 S.Ct. 439 (2013).

### C. Harmless Error

If a "[federal] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." *Howard*, 406 F.3d at 122 (citations omitted). Asked must be whether the application of the law "had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 115 S.Ct. 992, 994 (1995) (citations omitted).

"When a [federal judge in a *habeas* proceeding] has grave doubt about whether a trial error . . . had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win." *Wood v. Ercole*, 644 F.3d 83, 99 (2d Cir. 2011) (citations omitted) (holding that petitioner's videotaped statement made after he invoked his right to counsel was wrongfully admitted at trial and not harmless error).

### V. Plea Agreements

Plea bargaining, defined as the exchange of official concessions for a defendant's act of self-conviction, is a well-established feature of the United States criminal justice system. *See* Laurie L. Levenson, *Peeking Behind the Plea Bargaining Process: Missouri v. Frye & Lafler v. Cooper*, 46 Loy. L.A. L. Rev. 457, 468 (2013); Albert W. Alschuler, *Plea Bargaining and Its History*, 79 Colum. L. Rev. 1, 1 (1979).

> These concessions may relate to the sentence imposed by the court or recommended by the prosecutor, the offense charged, or a variety of other circumstances; they may be explicit or implicit; and they may proceed from any of a number of officials. The benefit offered by the defendant, however, is always the same: entry of a plea of guilty.

Alschuler, *supra* at 3–4.

## A. History

### 1. Influence of English Practices

The practice dates to medieval times. *See North Carolina v. Alford*, 400 U.S. 25, 35 n.8 (1970) (holding criminal defendant does not have constitutional right to have guilty plea accepted by court). In *Alford*, the Supreme Court explained:

> The plea may have originated in the early medieval practice by which defendants wishing to avoid imprisonment would seek to make an end of the matter . . . by offering to pay a sum of money to the king. An early 15th-century case indicated that a defendant did not admit his guilt when he sought such a compromise, but merely "that he put himself on the grace of our Lord, the King, and asked that he might be allowed to pay a fine (petit se admittit per finem)." A 16th-century authority noted that a defendant who so pleaded "putteth hym selfe in Gratiam Reginae without anye more, or by Protestation that hee is not guiltie . . . ," while an 18th-century case distinguished between a nolo plea and a jury verdict of guilty, noting that in the former the defendant could introduce evidence of innocence in mitigation of punishment, whereas in the latter such evidence was precluded by the finding of actual guilt.

*Id.* (citations omitted).

During the seventeenth and eighteenth centuries it was uncommon to resolve criminal cases with a plea of guilty. *See* Alschuler, *supra* at 8. Two key factors contributed to the infrequent use of the plea bargain during this time period. *First*, the brevity and simplicity of trials allowed informally selected juries to hear up to twenty cases per day. *Id.* Trial efficiency was due largely to undeveloped laws of evidence, jury selection, and the lack of a right to

counsel in criminal cases. *Id. Second*, judges were hesitant to accept guilty pleas. *See*

Levenson, *supra* at 466.

> The [English] case of Stephen Wright in 1743 seems especially
> revealing. Wright announced that he would plead guilty to robbery
> in order to spare the court trouble, and he expressed hope that the
> court and jury would recommend executive commutation of the
> death sentence mandated for this crime. The court responded, in
> effect, that the defendant had it backwards, for the court could not
> take notice of any favorable circumstances in his case unless he
> agreed to stand trial. Wright then yielded to the court's advice.

Alschuler, *supra* at 9.

### 2. Early American Practices and Controversies (1700s–1850s)

English legal methods and practices played a significant role in the development of early

United States court practice. Plea bargaining in the United States was uncommon throughout the

eighteenth century and the first half of the nineteenth century. The scarcity of these types of

bargains can be traced to the same key factors affecting plea bargaining in England, namely, the

expeditious nature of criminal trials and judicial moral disapproval of the practice. *See*

Levenson, *supra* at 465–66.

### a. Expeditious Nature of Criminal Trials

The efficiency of criminal trials in the United States was influenced by three key

phenomena: (1) the absence of defense counsel in the vast majority of cases, *id.*; (2) the paucity

of evidentiary rules, John H. Langbein, *Understanding the Short History of Plea Bargaining*, 13

L. & Soc'y Rev. 261, 262 (1979); Glen Weissenberger, *Evidence Myopia: The Failure to See the

Federal Rules of Evidence As A Codification of the Common Law*, 40 Wm. & Mary L. Rev.

1539, 1567–68 (1999) (explaining the history of the Federal Rules of Evidence and their ultimate

promulgation by the Supreme Court in 1972); and (3) the lack of a right to appeal the outcome of

criminal cases, Langbein, *supra* at 264; Marc M. Arkin, *Rethinking the Constitutional Right to a*

*Criminal Appeal*, 39 UCLA L. Rev. 503, 521–23 (1992) (explaining history of the birth of the criminal appeal as a "creature of the nineteenth century").

### b. Judicial Moral Disapproval of Plea "Bargaining" Process

The limited criminal case backlog, coupled with a lack of court calendar congestion, meant that judges proceeded with caution when confronted with a plea deal in the eighteenth and nineteenth centuries. They often urged defendants to proceed to trial and forego a deal. *See* Levenson, *supra* at 466; *see also Hallinger v. Davis*, 146 U.S. 314, 324 (1892) ("The [trial] court refrained from at once accepting [the defendant's] plea of guilty, assigned him counsel, and twice adjourned, for a period of several days, in order that he might be fully advised of the truth, force, and effect of his plea of guilty."); *Green v. Commonwealth*, 94 Mass. 155, 175–76 (1866) (noting the "well settled practice" of receiving guilty pleas with "great reluctance and caution").

"Courts were uncomfortable with the idea of an innocent defendant admitting to an offense that he or she did not commit, just for the sake of receiving a lower sentence." Levenson, *supra* at 466. Judges were cognizant of the possibility that offenders could be coerced into "involuntarily confessing guilt out of fear or false hope." *Id.* In *Battis*, for example, where a defendant accused of raping and killing a teenage girl pled guilty, the court strongly advised him to let the government prove his guilt, emphasizing that he was not required to plead guilty. *See Commonwealth v. Battis*, 1 Mass. 95, 95–96 (1804). Despite the court's urging, the defendant refused to change his plea. *Id.* at 96. The court then went so far as to send him back to prison to rethink his decision. *Id.* The defendant still chose to plead guilty, which the court ultimately accepted, but not without the following caveat: "The Court will not direct an *immediate* entry of the plea of guilty to an indictment for a capital crime, but will give a reasonable time to the prisoner to consider of the same, that he may, if he think proper, retract his plea." *Id.* at 95 (emphasis in original).

Judicial officers were concerned that heinous crimes might go unpunished as part of a plea deal. *See* Steven P. Grossman, *An Honest Approach to Plea Bargaining*, 29 Am. J. Trial Advoc. 101, 103–04 (2005) ("This history of plea bargaining in this country is filled with intellectual dishonesty stemming often from the belief that there was something dirty about allowing those accused of crimes to 'cop a plea.' Common were the images of back door deals between lawyers and judges in which defendants often charged with horrible crimes pled guilty to far less serious crimes.").

### 3. Upsurge in Plea Deals (1850s–1970s)

While in 1839 only twenty-five percent of New York State's felony convictions resulted from guilty pleas, by 1860 the majority of such convictions were resolved by plea. *See* Alschuler, *supra* at 10; Bruce P. Smith, *Plea Bargaining and the Eclipse of the Jury*, 1 Ann. Rev. L. & Soc. Sci. 131, 136 (2005). By the 1920's, over eighty percent of felony cases in major cities such as New York, Chicago, Cleveland, and Los Angeles were all disposed of through the plea process. *Id.* at 132.

The upsurge of plea deals can be attributed to a series of Supreme Court decisions granting criminal defendants a constitutional right to counsel, culminating in the Court's seminal ruling in *Gideon v. Wainwright* in 1963. *See Powell v. State of Alabama*, 287 U.S. 45, 71 (1932) ("In the light of the facts outlined in the forepart of this opinion—the ignorance and illiteracy of the defendants, their youth, the circumstances of public hostility, the imprisonment and the close surveillance of the defendants by the military forces, the fact that their friends and families were all in other states and communication with them necessarily difficult, and above all that they stood in deadly peril of their lives—we think the failure of the trial court to give them reasonable time and opportunity to secure counsel was a clear denial of due process."); *Grosjean v.*

*American Press Co.*, 297 U.S. 233, 243–44 (1936) ("[C]ertain fundamental rights, safeguarded by the first eight amendments against federal action, were also safeguarded against state action by the due process of law clause of the Fourteenth Amendment, and among them the fundamental right of the accused to the aid of counsel in a criminal prosecution."); *Johnson v. Zerbst*, 304 U.S. 458, 463 (1938) ("The Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he was or waives the assistance of counsel.").

In *Gideon*, the lower court had refused to appoint counsel for an indigent defendant because Florida law only permitted appointment of counsel for capital offenses. *Gideon v. Wainwright*, 372 U.S. 335, 337 (1963). The defendant was forced to represent himself. *Id.*

> Put to trial before a jury, Gideon conducted his defense about as well as could be expected from a layman. He made an opening statement to the jury, cross-examined the State's witnesses, presented witnesses in his own defense, declined to testify himself, and made a short argument "emphasizing his innocence to the charge contained in the Information filed in this case." The jury returned a verdict of guilty, and petitioner was sentenced to serve five years in the state prison.

*Id.* Refusal to appoint counsel in federal and state cases, it was held, was "offensive to the common and fundamental ideas of fairness," amounting to a denial of due process. *Id.* at 339.

*Gideon* was broadly applied. *See White v. Maryland*, 373 U.S. 59, 60 (1963) (extending right to counsel to preliminary hearings in criminal cases); *Douglas v. California*, 372 U.S. 353, 357–58 (1963) (extending right to counsel to direct appeals in criminal cases); *Escobedo v. Illinois*, 378 U.S. 478, 490–91 (1964) (extending right to counsel to uncharged criminal suspect); *United States v. Wade*, 388 U.S. 218, 237 (1967) (extending right to counsel to post-indictment line-ups); *Argersinger v. Hamlin*, 407 U.S. 25, 36–37 (1972) (extending right to counsel to misdemeanor cases).

The right of criminal defendants to counsel corresponded with an increased caseload for judges.

> The "crime wave" of the 1960's, produced in part by the post-World War II baby boom and by the increased proportion of young people in American society, led to expanded caseloads, and as the volume of traditional crime increased, the courts also confronted cases involving marijuana and other victimless crimes in greatly increased numbers. These developments led to a major administrative crisis in the courts. The volume of criminal cases commonly doubled from one decade to the next, while judicial resources increased only slightly.

Alschuler, *supra* at 34–35. Heavier caseloads forced prosecutors to institute bargaining systems that allowed them to dispose of minor cases expeditiously. *Id.* at 32. In 1945, for example, eighty-five percent of the 36,114 cases brought in federal court were resolved by guilty pleas. *See Sourcebook of Criminal Justice Statistics Online*, University of Albany, Table 5.22.2010, http://www.albany.edu/sourcebook/pdf/t5222010.pdf (last visited August 10, 2015). By 1955, eighty percent of the 35,501 federal cases brought were settled by plea deals. *Id.* In 1965, post *Gideon*, ninety percent of the 28,757 federal cases opened were resolved with plea agreements. *Id.*

In 1970, the Supreme Court declared constitutional the practice of plea bargaining. *See Brady v. United States*, 397 U.S. 742, 747–48 (1970) (holding guilty pleas are not constitutionally forbidden and are valid if made voluntarily and intelligently); *Santobello v. New York*, 404 U.S. 257 (1971) (same).

> [G]uilty pleas are not constitutionally forbidden, because the criminal law characteristically extends to judge or jury a range of choice in setting the sentence in individual cases, and because both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law.

51

*Brady*, 397 U.S. at 751–52. "For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious—his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated." *Id.* at 752.

> For the State there are also advantages—the more promptly imposed punishment after an admission of guilty may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof.

*Id.*; *see also Santobello*, 404 U.S. at 260 ("[Plea bargaining] is an essential component of the administration of justice. Properly administered, it is to be encouraged. If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities."); *People v. Selikoff*, 318 N.E.2d 784, 788 (N.Y. 1974) ("[Plea negotiations] are essential to relieve court calendar congestion and they relieve the prosecution and defense from the risks and uncertainties of trial.")

### 4. Modern Acceptance (1970s–Today)

Today, approximately ninety-four percent of all state convictions and ninety-seven percent of all federal convictions are resolved by plea bargaining. *See Missouri v. Frye*, 132 S.Ct. 1399, 1407 (2012) (holding that defense counsel had duty to communicate formal offer from the prosecution to accept a plea on terms and conditions that may be favorable to the accused). Plea bargaining has become a reflexive response to the time-consuming, costly, and complex nature of jury trials. *See* Paul Schectman, *The Dynamics of the Plea Bargain*, N.Y. L.J. (June 8, 2015), http://www.newyorklawjournal.com/id=1202728584215/The-Dynamics-of-the-

Plea-Bargain?slreturn=20150713193756 ("[O]ne of the reasons we plea bargain so many cases is that our procedures for trying cases have become so complex.").

In 2008, in New York State, of the 62,944 felony indictments issued, only 3,354, or five percent, were tried by jury. *See Chapter 1: Criminal Justice System for Adults in NYS*, New York State Office of Mental Health (2008), http://www.omh.ny.gov/omhweb/forensic/manual/html/chapter1.htm; *see also* Schectman, *supra* ("[P]lea bargaining now dominates our criminal justice system because the ability of prosecutors to coerce guilty pleas has increased so dramatically."); *cf.* Cynthia Alkon, *The U.S. Supreme Court's Failure to Fix Plea Bargaining: The Impact of Lafler and Frye*, 41 Hastings Const. L.Q. 561, 590 (2014) ("Prosecutors, in particular, would resist plea bargaining reform if such changes were thought to undermine their power in the system, which, in part, enables them to exercise control over their caseloads.").

The rise in plea deals led the Supreme Court in 2012 to confront the issue of whether the right to counsel in criminal cases extends to the plea bargaining process in a pair of companion cases. *See Lafler v. Cooper*, 132 S.Ct. 1376 (2012); *Frye*, 132 S.Ct. at 1399. It found that counsel was required. *See Lafler*, 132 S.Ct. at 1384 (holding that if plea bargain has been offered, defendant has right to effective assistance of counsel in considering whether to accept it); *Frye*, 132 S.Ct. at 1399 (holding that, as a general rule, defense counsel has duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused).

**B. Law**

### 1. Judicial Discretion to Vacate Plea Bargains

Judges have a limited role in the plea bargaining process. But the New York Court of Appeals has definitively held that "some judicial discretion in overseeing and approving plea

bargains, including the imposition of conditions, is desirable." *People v. Avery*, 650 N.E.2d 384, 386 (N.Y. 1995) ("[P]lea negotiations serve the ends of justice, enabling courts to impose individualized sentences . . . . The determination of an appropriate sentence requires the exercise of discretion after due consideration given to, among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction."); *see also People v. Glendenning*, 487 N.Y.S.2d 952, 953–54 (Sup. Ct. 1985) ("The judicial role in plea bargaining is that of overseeing and supervising the delicate balance of public and private interests. The court is to act as an impartial referee and not as an advocate. This posture keeps the court within the scope of the separation of powers doctrine, under which the executive branch, represented by the prosecutor, has the primary responsibility for determining which violations of the law shall be prosecuted.").

Under New York law it is within the court's discretion to accept a plea, reject a plea, or attach reasonable conditions to the acceptance of a plea. *See, e.g., People v. Shervington*, 807 N.Y.S.2d 144, 145 (App. Div. 2006) (holding that it is not fundamentally unfair for court to condition its granting of permission to enter plea upon condition that defendant admit he acted in concert with two codefendants who were under indictment for the same crimes). It is well settled that "*any sentence promise at the time of plea is, as a matter of law and strong public policy, conditioned upon its being lawful and appropriate in light of the subsequent presentence report or information obtained from other reliable sources*[.]" *People v. Pittman*, 514 N.Y.S.2d 88, 89 (App. Div. 1987) (emphasis added) (citing *Selikoff*, 318 N.E.2d at 792).

Where sentencing pursuant to the terms of a plea agreement is inappropriate, the court must offer the defendant the opportunity to withdraw the plea or accept an offered appropriate sentence. *See Selikoff*, 318 N.E.2d at 791; *Pittman*, 514 N.Y.S.2d at 89 (same); *People v.*

*Walker*, 591 N.Y.S.2d 77, 77 (App. Div. 1992) (same); *People v. Tesiero*, 584 N.Y.S.2d 228, 228

(App. Div. 1992) ("[W]here the information disclosed in a presentence report persuades the

sentencing court that the negotiated sentence is inappropriate, the proper course is to permit the

defendant the choice of either withdrawing his plea or accepting an appropriate sentence.");

*People v. Esposito*, 32 N.Y.2d 921, 923 (1973) ("[I]t was erroneous as a matter of law when,

upon the defendant's sentencing, the court did not inform the defendant that the plea bargaining

agreement could not be kept.").

 In *Easterling*, the Appellate Division held that the trial court erred when it unilaterally

vacated the defendant's plea of guilty to assault in the first degree. *People v. Easterling*, 584

N.Y.S.2d 228, 228 (App. Div. 1992). A plea agreement to assault in the first degree in exchange

for a promised sentence of five years of probation and youthful offender treatment had been

entered into. *Id.* at 579. On the scheduled sentencing date, the court indicated that it could not

approve the sentence because of the nature and extent of the injuries suffered by one of the

complainants. *Id.* The court then *sua sponte* vacated the defendant's plea of guilty, ordering the

case proceed to trial. *Id.* The Appellate Division on review stated that "the court's action in

unilaterally vacating the plea of guilty constituted error." *Id.* at 580. The reviewing court

explained that where a court finds that it cannot honor a sentencing promise, it must give the

pleading defendant the option of either accepting an enhanced sentence on the plea or

withdrawing the plea and going to trial. *Id.*

 In *Rubendell*, the prosecutor had confused the defendant's case with another and

mistakenly offered him a plea deal involving only six months incarceration instead of the

intended seven-year sentence. *People v. Rubendell*, 772 N.Y.S.2d 346, 350 (App. Div. 2004).

The defendant accepted. *Id.* at 348. Upon discovering the mistake, the government successfully

prevailed in vacating the guilty plea. *Id.* at 350. Defendant entered into another plea, was sentenced, and then sought to enforce the earlier agreement. *Id.* at 349. The Appellate Division found that the trial court "erred in unilaterally vacating the defendant's initial plea of guilty over his objection." *Id.* at 352. It held that the sentencing court "should have afforded the defendant the option to withdraw that plea and proceed to trial, or allowed the plea to stand if the defendant was willing to face a sentence other than the one which was purportedly promised." *Id.* (citations omitted). Because the trial court had failed to offer defendant either option, the case was remanded. *Id.* Underscored, however, was that "the *defendant is not entitled to the benefit of the favorable sentence he was offered at the time of his initial plea.*" *Id.* at 347 (emphasis added); *see also People v. Jones*, 472 N.Y.S.2d 460, 461 (App. Div. 1984) ("Under the circumstances presented, namely, that there were no new facts meriting a harsher sentence disclosed through the presentence report or from any other legitimate source, the sentencing court was not at liberty to disregard its promise on the sole ground that it had inadvertently failed to apprise defendant or his attorney of its intent to impose an additional term of probation.").

### 2. Information Considered Regarding Appropriate Sentence

#### a. Breadth

In assessing the proper sentence, it has "long [been] recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider . . . in determining the kind and extent of punishment to be imposed." *Pepper v. United States*, 562 U.S. 476, 480 (2011). "'Highly relevant . . . to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Id.* (quoting *Williams v. New York*, 337 U.S. 241, 246–47 (1949)) (holding that the district court may consider evidence of a defendant's post-sentence rehabilitation, and that such evidence may support a downward variance from the federal sentencing guidelines). A "sentencing judge [is]

to consider every convicted person as an individual . . . ." *Pepper*, 562 U.S. at 487 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). "[T]he punishment should fit the offender and not merely the crime." *Pepper*, 562 U.S. at 487–88. "Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant." *Id.* at 488.

"[A]s a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Witte v. United States*, 515 U.S. 389, 398 (1995) (citations omitted) (holding that the due process clause does not require courts to "abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence"). The conduct taken into consideration must be "proved by a preponderance of the evidence." *Id.* at 401; *see also United States v. Watts*, 519 U.S. 148, 155–56 (1997) (finding that sentencing court may consider conduct of which defendant has been acquitted, so long as that conduct has been proved by a preponderance of the evidence).

Judges are allowed to consider a breadth of information that sheds light on a defendant's background and characteristics relevant to the imposition of a sentence.

> A sentencing judge does not consider [a] broad range of information to punish a defendant for conduct other than the crime of conviction. Rather, a sentencing judge properly considers such information to assess the real seriousness of the offense of conviction; to understand the history and characteristics of the defendant; and to fashion a sentence that provides just punishment, protects the public, and deters the defendant from further criminal conduct.

*United States v. Broxmeyer II*, 708 F.3d 132, 135 (2d Cir. 2013) (citations omitted); *see also, e.g.*, *People v. Mattuci*, 937 N.Y.S.2d 727, 729 (App. Div. 2012) ("[N]egotiated sentence was inappropriate based upon information in the presentence report, including the circumstances

surrounding an unrelated offense upon which defendant was then being held, the victim impact statements, defendant's criminal record and the fact that defendant was uncooperative in the preparation of the report."); *People v. Naranjo*, 681 N.E.2d 1272, 1273 (N.Y. 1997) ("'[S]entencing courts are wisely allocated wide latitude as they are recognized to be in a superior position to dispense proportionate and fair punishment[.]'" (citations omitted)); *cf. United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (finding that during sentencing "*a district judge may consider hearsay statements*, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in an acquittal[.]" (emphasis added)).

> To aid a judge in exercising this discretion intelligently the New York procedural policy encourages him to consider information about the convicted person's past life, health, habits, conduct, and mental and moral propensities. The sentencing judge may consider such information even though obtained outside the courtroom from persons whom a defendant has not been permitted to confront or cross-examine.

*Williams*, 337 U.S. at 245.

While the sentencing of each individual criminal defendant is unique, courts are faced with the same overarching abstract questions when deciding an appropriate sentence:

> How serious was the criminal conduct? What was the loss to the victims and society, both monetary and otherwise? How culpable was the defendant, and what was his role? What motivated him to break the law? Were there any mitigating factors? What is his state of mind now? Is he remorseful? Did he break the law before? Is he likely to do it again? Does he deserve another chance? Will he redeem himself? Did he otherwise lead a productive life, and was this an aberrational mistake? What is the impact on the defendant's family?

Denny Chin, *Sentencing: A Role For Empathy*, 160 U. Pa. L. Rev. 1561, 1575 (2012) (addressing judge's own federal sentencing practice).

### i. Presentence Report

Generally, New York courts rely on a presentence report in determining the appropriateness of a sentence. *See* N.Y. Crim. Proc. Law § 390.20(1) ("In any case where a person is convicted of a *felony*, the court *must* order a pre-sentence investigation of the defendant and it may not pronounce sentence until it has received a written report of such investigation." (emphasis added)). The investigation supporting the presentence report includes the gathering of a wide variety of information—including a criminal, social, employment, family, economic, education and personal history of defendant; information "with respect to the circumstances attending the commission of the offense"; and other information that the court directs to be included or is otherwise deemed relevant to sentence. *See* N.Y. Crim. Proc. Law § 390.30; *see also Hicks*, 774 N.E.2d at 208 ("The presentence report may well be 'the single most important document at both the sentencing and correctional levels of the criminal process.'" (citations omitted)).

### ii. *Ex Parte* Communications

New York courts have considered the validity of a sentencing court's consideration of *ex parte* communications submitted prior to sentencing. So long as the *ex parte* communications are openly disclosed to both parties, the court is permitted to consider the contents of those communications in imposing a proper sentence. *See, e.g.*, *People v. McConnell*, 402 N.E.2d 133, 137 (N.Y. 1980) ("It is, however, the substance of the believable information received rather than the channel through which it comes to the court which should guide . . . the decision whether to honor the [plea]."); *People v. Gregorio*, 443 N.Y.S.2d 589, 592 (Sup. Ct. 1981) ("The key to proper sentencing procedures 'is whether the defendant has been afforded an

opportunity to refute those aggravating factors' which may negatively influence the court."

(citations omitted)).

> [C]itizens have their own constitutional rights to communicate with the courts as their elected public officials, whether on behalf of the defendant or the alleged victim. Counsel cannot reasonably be expected to control every exercise of freedom of speech by individual citizens, whether they be friends of the victim or the defendant, or are *just concerned members of the public*.
>
> . . . .
>
> A Judge should not consider *ex parte* communications; but, written documents provided to the court, whether supplied by either side or unsolicited, can be considered by the court *where they are openly disclosed to the parties*. This court concludes, therefore, that all of the[] letters [offered here] are not *ex parte* communications under these circumstances. The court is satisfied that they can be considered in plea and sentence negotiations.

*People v. Michael M.*, 475 N.Y.S.2d 774 (Cnty. Ct. 1984) (emphasis added).

### b. Due Process Considerations

The due process clause does not render a sentence void merely because a judge obtains additional out-of-court information to assist in the exercise of sentencing power. *Id.* at 252. *But cf. id.* n.18 ("What we have said is not to be accepted as a holding that the sentencing procedure is immune from scrutiny under the due process clause." (citation omitted)).

"Due process requires that the defendant not be sentenced on the basis of materially false information, and he is thus entitled to an effective opportunity to respond to the sentencing position advanced by the government[.]" *United States v. Alexander*, 860 F.2d 508, 511–12 (2d Cir. 1988); *see also Arocho v. Walker*, No. 01-CV-1367, 2001 WL 856608, at *4 (S.D.N.Y. July 27, 2001) ("[A] defendant does have a due process interest in the procedures used during sentencing . . . [and such due process] dictates that a sentence may not be based on materially false facts or misinformation, an effective chance to respond to the information presented to the sentencing court is critical.").

In *Farrar*, the New York Court of Appeals acknowledged that an appropriate sentence cannot be determined at the time of the plea. Rather, "the determination of an appropriate sentence requires the exercise of discretion after due consideration given to, among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, *i.e.*, societal protection, rehabilitation and deterrence." *People v. Farrar*, 419 N.E.2d 864, 865 (N.Y. 1981) (citations omitted). "[W]hile the court legitimately may indicate that a proposed sentence is fair and acceptable, the necessary *exercise of discretion cannot be fixed immutably at the time of the plea, for the decision requires information that may be unavailable then.*" *Id.* (emphasis added).

### 3. Specific Performance

An unfulfilled sentencing promise requires either that the plea of guilty be vacated or the promise fulfilled. There is no indicated preference for one course over another. *Selikoff*, 318 N.E.2d at 792. The choice is in the discretion of the sentencing court. *Id.* Refusal on the part of defendant to withdraw the plea and proceed to trial does not entitle him or her to specific performance of the original plea agreement. *Tesiero*, 584 N.Y.S.2d at 228 (affirming judgment of lower court denying defendant specific performance of original plea deal); *see also Walker*, 591 N.Y.S.2d at 77 (finding defendant's refusal to withdraw plea did not entitle him to specific performance of the original plea deal, and holding lower court appropriately gave defendant option to either withdraw plea or accept a one-year jail sentence after it indicated it was no longer willing to impose negotiated sentence in light of its review of presentence probation report and victim impact statement); *Pittman*, 514 N.Y.S.2d at 88 (holding defendant's refusal to withdraw plea when afforded opportunity by sentencing court, which had reviewed presentence report and found terms of plea deal inappropriate, was not entitled to specific performance of

61

original plea); *cf. People v. Jenkins*, 898 N.E.2d 553 (N.Y. 2008) (defendant not entitled to specific performance of plea bargain where he failed to uphold his end of deal which required him to provide documentary proof of attendance in drug rehabilitation program); *People v. Curdgel*, 634 N.E.2d 199 (N.Y. 1994) (defendant who initially cooperated with prosecution pursuant to plea agreement, but then willfully acted to eliminate his usefulness as a prosecution witness, was not entitled to specific performance).

The New York Court of Appeals has emphasized the trial court's discretion to vacate a guilty plea:

> [T]he failure or inability to fulfill a promise requires either that the plea of guilty be vacated or the promise fulfilled, but there is no indicated preference for one course over the other. The choice rests in the discretion of the sentencing court.
>
> . . .
>
> The promise must be fulfilled provided there is nothing contained in the presentence report *or in later learned facts rendering improvident the sentence*. Where a court cannot or will not impose the sentence previously promised it *should specify on the record the information contained in the presentence report or any other circumstance relied upon for its changed view*.

*Selikoff*, 318 N.E.2d at 792 (emphasis added) (citation omitted) (finding court correctly refused to impose original terms of plea agreement after discovering defendant was actually a principal, not a pawn, in a fraudulent scheme, and holding that defendant's refusal to withdraw his plea did not entitle him to specific performance of original plea agreement).

Defendant is entitled to specific performance of a plea agreement *only* where it can be shown that he or she relied on the original promise to his or her detriment. Reliance may include cooperating with authorities or testifying against a codefendant. *People v. Danny G.*, 461 N.E.2d 268, 271 (N.Y. 1984) (holding specific performance of plea agreement proper remedy where defendant testified against all of his co-conspirators, and where court later unilaterally breached

original plea agreement by imposing a ninety day term of incarceration in addition to sentence of probation that had been earlier agreed to, without first providing defendant with opportunity to withdraw plea on the record); *People v. Harris*, 661 N.Y.S.2d 817 (App. Div. 1997) (defendant entitled to specific performance of plea agreement, even though he was arrested several days after plea on unrelated drug charges, because condition that he not be rearrested was not part of plea agreement, and in reliance on agreement provided extensive cooperation to prosecution); *People v. Grimaldi*, 607 N.Y.S.2d 57, 57 (App. Div. 1994) (specific performance ordered where original plea agreement provided defendant would receive one to five years imprisonment in exchange for cooperation in ferreting out organized fraud crimes, and sentencing court later departed from deal by imposing two to seven year term without giving any legitimate reasons for departure on record).

In *McConnell*, the plea agreement provided that, in exchange for the defendant's cooperation in testifying against his codefendant, the maximum sentence would be ten years. *McConnell*, 402 N.E.2d at 137. The defendant was entitled to specific performance of his plea deal when he completed his negotiated responsibilities to testify before both the grand and petit juries, waiving his right to self-incrimination and placing himself in a position from which he would be unable to recover. *Id.* The court emphasized that "in holding [defendant] entitled to specific performance of the plea bargain, we do so as a matter of essential fairness, rather than as a matter of constitutional obligation." *Id.* At sentencing, the court said: "[B]ased on what I know of this at this point, unless something comes to my attention that changes it, in the Probation report I am inclined to agree with the recommendation of the District Attorney's office in this case." *Id.* at 134. A few days later, defendant testified at the trial of a codefendant. *Id.* When defendant subsequently appeared for sentencing, the sentencing judge admitted "[t]here is

nothing in that sentencing report that I didn't know," but refused to enforce the plea agreement because the codefendant's trial revealed that "[defendant] had 'stabbed the person' which he had not previously known and that 'I agreed providing it was based upon what I knew at that time.'" *Id.* at 135. The New York Court of Appeals held that the defendant was entitled to specific performance of the plea because he had put himself in a bad position in reliance on the agreement. *Id.* at 136.

> [B]y living up to his part of the bargain defendant has put himself, as the County Judge acknowledged, in a no-return position and because the additional information which came to the Judge's attention after the bargain was struck was not of such nature as to warrant refusal to go along with the bargain which defendant had fully performed.

*Id.*

### C. Application

A defendant who knowingly and voluntarily enters into a plea deal with the government, as petitioner did here, is exchanging his or her right to a jury trial for a reduced sentence. *See generally supra* Part V.A. In accepting responsibility for one or more crimes charged, a defendant is relieving the prosecution from the risks and uncertainties associated with a jury trial, and preserving scarce judicial and prosecutorial resources. *See supra* Part V.A.3–4. Nevertheless, in light of subsequent information brought to the court's attention about the adverse history and characteristics of the defendant, a plea deal may not be honored. *See supra* Part V.B.1–2. Information revealed at a reliable hearing, at which the defendant has had the opportunity to contest adverse evidence, can be considered where proved by a preponderance of the evidence. *See supra* Part V.B.2.a.

Where the information revealed indicates the terms of the plea are inappropriate, it is the responsibility of the trial judge to restore the defendant to the position he or she was in prior to

entering into the plea bargain. *See* supra Part V.B.1. The defendant must be allowed to withdraw the plea and either proceed to trial or accept a sentence deemed appropriate by the sentencing judge on the basis of the new reliable information. *Id.*

In the instant case, the trial judge was painstakingly clear that, by entering into a plea bargain with the state, petitioner was doing so in exchange for his right to a jury trial. *See supra* Part III.A. (The Court: "By pleading guilty, you give up [your] rights [to a jury trial and all its corresponding privileges]. Do you understanding that?"; Petitioner: "Yes."). When petitioner's troubling history came to the light of the court, it was incumbent on the court to fashion a sentence that provided just punishment, protected the public, and deterred defendant from further criminal conduct. *See supra* Part V.B.2.a. Instead of a one to three year plea deal, the court offered petitioner three to nine years after carefully weighing all information provided by the parties, including petitioner's admission in a deposition that he was the leader of the dangerous FRAPH organization. *See supra* Part III.C.5.a; *see also supra* Part III.C.2 ("No, I was not the only FRAPH member. I was the—one of the FRAPH leaders. I'm not a member of FRAPH. I'm a leader of FRAPH.").

Petitioner's contention that his due process rights were violated when the court *sua sponte* vacated his plea without affording the option of withdrawing his plea fails. *See* Aug. 13, 2015 Hr'g Tr. The revised plea deal offered by the court was reasonable in light of the newly revealed background of defendant. *See supra* Part III.C.1–2. That it took the judge five months to offer petitioner the enhanced sentence does not rise to a due process violation. *See* Aug. 13, 2015 Hr'g Tr. Five months afforded the parties time to provide materials on this important issue, and time for the court to reflect on the newly submitted information when fashioning an appropriate sentence. *Id.* After petitioner voluntarily and knowingly rejected the enhanced

sentencing offer, he was not entitled to specific performance of the original deal. *See supra* Part V.B.3; *see also* Aug. 13, 2015 Hr'g Tr.

The claim that petitioner was harmed by the fact that the court operated *sua sponte* in the plea *vacatur* is not supported. That the court's action prevented petitioner from receiving the benefit of having his unrelated mortgage fraud crimes in Suffolk County run *concurrently* with his distinct mortgage fraud in Kings County was not detrimental. *See supra* Part V.B.3.

No violation of petitioner's right to due process can be found in the facts of this case.

## VI. Double Jeopardy

### A. Law

The double jeopardy clause of the Fifth Amendment provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause protects against the following three situations: (1) "a second prosecution for the same offense after acquittal," (2) "a second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *Ohio v. Johnson*, 467 U.S. 493, 498 (1984) (citing *Brown v. Ohio*, 432 U.S. 161, 165 (1977)); *see also Morris v. Reynolds*, 264 F.3d 38, 49 (2d Cir. 2001) ("[T]he double jeopardy bar prohibits not only multiple punishments for the same offense, but also a second prosecution following conviction[.]").

The prohibition of multiple successive prosecutions, the double jeopardy claim at issue in this case as urged by defendant, serves two interests. *First*, it preserves the criminal defendant's interest in the finality of judgment. *See Brown*, 432 U.S. at 165 ("Where successive prosecutions are at stake, the guarantee serves 'a constitutional policy of finality for the defendant's benefit.'" (citation omitted)). *Second*, it prevents "[prosecutorial] overreaching." *Johnson*, 467 U.S. at 502. The defendant's interests are balanced with the state's "right to one full and fair opportunity to convict those who have violated its laws." *Id.* (citation omitted); *see also*

*Richardson v. United States*, 468 U.S. 317, 330 (1984) (characterizing a "full and fair opportunity to convict the defendant" as the opportunity to "present constitutionally sufficient evidence" to achieve a conviction).

The plea bargaining context is not immune from a double jeopardy, successive prosecution, analysis. *Kercheval v. United States*, 274 U.S. 220, 223 (1927) (holding petitioner's initial guilty plea to mail fraud, later vacated by district court at request of petitioner, could not then be put before a jury at trial as evidence of petitioner's guilt); *Ricketts v. Adamson*, 483 U.S. 1, 8 (1987) (holding double jeopardy bar on subsequent prosecution did not apply, even after defendant had been sentenced, when he breached conditions of his guilty plea and refused to testify for a second time at codefendants' retrial for murder).

"As a general rule, jeopardy attaches in a criminal case at the time the [court] accepts the defendant's guilty plea." *United States v. Aliotta*, 199 F.3d 78, 83 (2d Cir. 1999); *see also United States v. Olmeda*, 461 F.3d 271, 279 (2d Cir. 2006) (finding double jeopardy violated where conduct charged in second indictment in New York had previously been referenced in defendant's guilty plea to North Carolina indictment accepted by that court); *see also Morris*, 264 F.3d at 47–48 (finding jeopardy attached where court accepted defendant's plea on misdemeanor offense, government failed to object on basis of any pending felony charges, and proffered order reinstating felony charge, which appeared to predate initial plea, had been written after entry of the plea and was backdated to create appearance of pending charges at time of plea); *United States v. Cambindo Valencia*, 609 F.2d 603, 637 (2d Cir. 1979) (prosecution of defendant, who had been charged with conspiracy to import and distribute cocaine, was not barred by double jeopardy where a prior conviction for conspiracy was determined to constitute a separate offense; "[I]t is axiomatic of the double jeopardy clause that jeopardy attache[s] once

[defendant's] guilty plea was accepted[.]").

A guilty plea accepted unconditionally "is itself a conviction. . . . Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence." *Kercheval*, 274 U.S. at 223; *see also United States v. Broce*, 488 U.S. 563, 569 (1989) ("A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence."); *cf. Mabry v. Johnson*, 467 U.S. 504, 507–08 (1984) (finding petitioner had no constitutional right to a proposed plea agreement and was fully aware of the consequences of subsequent guilty plea; "It is the . . . guilty plea that implicates the Constitution.").

But the mere acceptance of a guilty plea by the court does not create an immutable bar to subsequent prosecution. *See Olmeda*, 461 F.3d at 279 n.7 (2d Cir. 2006). There are, "certain circumstances, [where] jeopardy is not deemed to [have] attach[ed] at the time of a guilty plea[.]" *Id.* Jeopardy fails to attach, for example, where a plea made is conditional on some future occurrence. *See Ricketts*, 483 U.S. at 8 (defendant's guilty plea to second degree murder was conditional on his later testifying against codefendants involved in murder); *Smith*, 865 F. Supp. 2d at 271 (holding jeopardy did not attach where defendant pled to one charge, but refused to voluntarily withdraw his plea to the second charge in accordance with the terms of the plea agreement); *Matthews v. Keane*, No. 94-CV-2815, 1995 WL 459251, at *1, 3 (S.D.N.Y. Aug. 3, 1995) (finding in *habeas* proceeding that jeopardy never attached to petitioner's plea that "was conditioned expressly on the absence of no new negative revelations in the then forthcoming pre-sentence report [because] . . . [j]eopardy attaches . . . only when the guilty plea is accepted unconditionally by the court") (citing *United States v. Sanchez*, 609 F.2d 761 (5th Cir. 1980)).

When a plea is conditional, jeopardy does not attach until all of the conditions have been

satisfied. *See United States v. Henriquez*, 731 F.2d 131, 136 (2d Cir. 1984) (finding no double jeopardy violation where guilty plea accepted conditionally); *see also Smith*, 865 F.Supp.2d at 282. Where acceptance of a plea deal is rendered contingent on further information being provided that may influence the outcome of acceptance of the deal itself, the plea is conditional. *See Rizzo v. Rock*, No. 08-CV-0269, 2009 WL 385453, at *4 (W.D.N.Y. Feb. 13, 2009) (finding jeopardy did not attach to guilty plea because plea agreement was necessarily conditioned on judge's later review and acceptance of information in presentence report). A conditional plea allows the court to vacate a plea agreement without the consent of the defendant, and without implicating the double jeopardy clause. *See Rodriguez v. Conway*, No. 06-CV-6358, 2010 WL 92911, at *13 (E.D.N.Y. Jan. 6, 2010) ("[J]eopardy does not attach when the court's acceptance of the guilty plea is conditional." (citing *Rizzo*, 2009 WL 385453)).

## B. Application

Petitioner's claim that he was subjected to double jeopardy when a jury was empaneled and he was tried and convicted for the same charges in the indictment that were previously disposed of by his guilty plea is not sustainable. *See supra* Part VI.A. His guilty plea was accepted conditionally. *See supra* Part III.A. The court stated that its acceptance was conditioned upon no new information of a serious nature coming to the court's attention that would otherwise render the terms of the plea unenforceable. *Id.* The nature of the information presented to the court made the original proposed sentence entirely inadequate.

Unfounded is petitioner's claim that double jeopardy attached when the court received the presentence investigation report, which contained no new information about petitioner that had not already been disclosed. *See supra* Part VI.A. Contrary to petitioner's contention, by rendering the plea conditional with respect to the revelation of new information "of a serious

nature" previously "unknown" to the court," the court was not prevented from considering information other than the presentence report. *See supra* Part V.B.2.a; *see also* Aug. 13, 2015 Hr'g Tr.

The double jeopardy claim is dismissed.

## VII. Improper Sentencing

### A. Law

The Supreme Court has stated that "[t]he Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.'" *See Miller v. Alabama*, 132 S.Ct. 2455, 2463 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2001)) (holding that mandatory life imprisonment without parole for those under the age of eighteen at the time of their crimes violates Eighth Amendment). This right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." *Miller*, 132 S. Ct at 2463 (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).

A defendant experiences excessive punishment where the imposed sentence is "grossly disproportionate" to the crime committed or "shocks the collective conscience of society." *United States v. Gonzalez*, 922 F.2d 1044, 1053 (2d Cir. 1991); *see also United States v. Snype*, 441 F.3d 119, 152 (2d Cir. 2006) ("The Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime. . . . [O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been extremely rare." (citations omitted)); *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); *Harmelin v. Michigan*, 501 U.S. 957, 959 (1991) ("The Eighth Amendment does not require strict proportionality between crime and sentence, but rather forbids only extreme

sentences that are grossly disproportionate to the crime."); *Donohue v. Lempke*, No. 09-CV-3890, 2012 WL 2930204, at *15 (E.D.N.Y. July 13, 2012) (denying *habeas* relief on ground of improper sentence where petitioner's sentence fell within statutory range); *Daniels v. New York*, No. 07-CV-00448, 2009 WL 2602267, at *19 (E.D.N.Y. Aug. 21, 2009) (same); *Davis v. Marshall*, No. CV-08-2674, 2008 WL 5100302, at *18 (E.D.N.Y. Dec. 2, 2008) (same).

### B. Application

Petitioner contends that he is entitled to *habeas* relief on the grounds that (1) the sentence imposed upon him was excessive, and (2) the sentencing court utilized improper information in coming to its determination.

Petitioner's first claim has no merit. The sentence issued does not "shock the conscience." *See supra* Part VII.A. Petitioner was convicted by a jury of six distinct counts related to a mortgage fraud scheme in Kings County. *See supra* Part III.D. Petitioner's sentence of twelve and one-third to thirty-seven years of imprisonment falls within the permitted statutory range, is reasonable, and is within the discretion of the sentencing judge. *See supra* Parts V.B.1–2 & VII.A. The appellate division did not misapply federal law in concluding on direct appeal that the sentence was not excessive. *See supra* Parts III.G & IV.B.

Unsubstantiated is petitioner's second claim, in which he essentially argues that the court sought to use his mortgage fraud crime as a pretense for punishing him for his alleged FRAPH activities. This claim is unfounded. The consideration of added information regarding the petitioner's past criminal acts falls squarely within the wide latitude given to sentencing judges, as recognized by the Supreme Court. *See supra* Parts IV & V.B.2. The record shows that petitioner was given adequate time to respond to the allegations made about his past and that he

in fact did respond to the allegations. *See supra* Part III.B–C. Consideration of this information by the court did not violate petitioner's due process rights. *See supra* Part V.B.2.b.

Petitioner's claim that his sentence was excessive or improper is dismissed.

## VIII. Insufficient Jury Instructions

### A. Law

"A jury instruction is improper where it creates a presumption that relieves the prosecution of its burden to prove the elements [of a crime] beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993). The Supreme Court has recognized the existence of "an especially heavy burden on a defendant who . . . seeks to show constitutional error from a jury instruction that quotes a state statute." *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) (citations omitted) (holding state court's jury instructions, which quoted accomplice-liability statute, were not ambiguous, and, even assuming ambiguity, state appellate court was reasonable in finding instructions were proper). "[E]ven if there is some ambiguity, inconsistency, or deficiency in the [jury] instruction, such an error does not necessarily constitute a due process violation." *Id.* (citations omitted). "Rather, the defendant must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relived the State of its burden of proving every element of the crime beyond a reasonable doubt." *Id.* (citations omitted).

In *Waddington*, there was no ambiguity found in the jury instructions by the Supreme Court with respect to the elements required for determining accomplice liability. *Id.* at 191. The Court found that the provided instructions "parroted the language of the [state's] statute . . . [,] [making it] impossible to assign any meaning to this instruction different from the meaning given to it by the [state] courts." *Id.* It was explained that even assuming the presence of ambiguity, the state appellate court "reasonably applied [Supreme] Court precedent" when determining that

72

there was no reasonable likelihood that the jury instruction "had relieved the State of its burden to prove every element of the crime beyond a reasonable doubt." *Id.* at 193.

A jury instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Id.* (citations omitted). "[I]t is not enough that there is some 'slight possibility' that the jury misapplied the instruction, [but rather] the pertinent question 'is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 191 (citations omitted). The Supreme Court has since recognized that "[a] trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Where "an error in a jury instruction is alleged, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001); *see also United States v. Sabhnani,* 599 F.3d 215, 237–40 (2d Cir. 2010) (collecting cases). In determining whether a federal due process violation has occurred, the Court of Appeals for the Second Circuit uses a two-step analysis. *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005) (finding refusal to provide jury with a justification instruction with respect to homicide charge fatally tainted defendant's weapons conviction and violated due process).

The "first step in the determination [of] whether [an] error violated the petitioner's federal due process rights" is "a finding that the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law[.]" *Jackson*, 404 F.3d at 621 (quoting *Davis*, 270 F.3d at 123). Under New York State law, as recognized by the Second Circuit, "[w]hether

an erroneous jury instruction is harmless . . . is analyzed for whether 'in light of the totality of the evidence, there is no reasonable possibility that the instructional error affected the jury's verdict.'" *Lynch v. Dolce*, 789 F.3d 303, 315 (2d Cir. 2015) (quoting *People v. Douglass*, 826 N.E.2d 796, 797 (N.Y. 2005)).

For the second step, a court should ask "whether the failure to give such a charge was sufficiently harmful to make the conviction unfair." *Jackson*, 404 F.3d at 621 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

In *Jackson*, the Court of Appeals for the Second Circuit employed the two step approach in determining whether a trial court's denial of a justification instruction fatally tainted the defendant's conviction for second degree criminal possession of a weapon and second degree manslaughter. *Jackson*, 404 F.3d at 621. The trial and appellate courts had erred by failing to provide the defendant with the instruction, and improperly concluded that "no reasonable view of the evidence support[ed] a justification charge." *Id.* at 624 (citations omitted). The failure to provide the requested charge resulted in an unfair conviction, since there was "substantial likelihood that a properly instructed jury would have found in Jackson's favor on the homicide charge." *Id.* at 625 (citations omitted). Defendant was granted *habeas* relief because the state appellate court had misapplied Supreme Court precedent in finding that the trial had not been infected by the erroneous charge. *Id.*

When alleged erroneous jury instructions either stem or quote directly from the state statute or fail to infect the trial and conviction in a manner violating due process, courts routinely deny *habeas* relief. *See, e.g.*, *Robinson v. Heath*, No. 12-CV-2116, 2013 WL 5774544, at *6 (E.D.N.Y. Oct. 24, 2013) (instructions provided in jury's request for clarification did not conflict with state law, violate due process, or counter established Supreme Court precedent); *Jones v.*

74

*New York*, No. 10-CV-9176, 2013 WL 208904, at *2 (S.D.N.Y. Jan. 16, 2013) (finding jury instructions pertaining to a drug factory, circumstantial evidence, and expert testimony were properly given and did not infect the trial or violate due process); *Jeffries v. Conway*, No. 10-CV-0549, 2012 WL 113775, at *9 (W.D.N.Y. Jan. 13, 2012) (jury instructions provided "tracked the language of the applicable pattern jury instruction"); *Rincon v. Burge*, Nos. 05-CV-0686, 05-CV-0687, 2010 WL 6789121, at *33 (S.D.N.Y. Sept. 8 2010) (finding defendant's due process rights not violated when trial court failed to include requested jury instructions that were not supported by evidence in the record, and therefore not required under state law); *McClean v. Green*, No. 05-CV-5603, 2009 WL 4854512, at *1 (E.D.N.Y Dec. 9, 2009) (trial court's instruction on accomplice liability was unambiguous, tracked the language of the pertinent state statute, did not relieve the prosecution of its burden of proof, and was not otherwise improper).

### B. Application

Petitioner errs in claiming that the trial court failed to provide an adequate jury charge. The instructions issued by the trial court were clear and sufficiently parroted the relevant New York statutes. *See supra* Part III.D.2; *see also* Aug. 13, 2015 Hr'g Tr. Petitioner was not deprived of a jury instruction to which he was entitled under state law. *See supra* Part VIII.A. The charge provided to the jury did not prejudice the defendant's conviction. *Id.*

Petitioner's claim regarding the inadequacy of the jury charge is dismissed.

## IX. Ineffective Assistance of Counsel

### A. Law

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14

(1970) (emphasis added). Effective assistance "does not guarantee the right to perfect counsel." *Burt*, 134 S. Ct. at 18.

### 1. Standard

Claims of inadequate assistance of counsel are governed by the *Strickland* standard, which declared that "legal representation violates the Sixth Amendment if it (1) falls 'below an objective standard of reasonableness,' as indicated by 'prevailing professional norms,' and (2) the defendant suffers prejudice as a result." *Chaidez v. United States*, 133 S.Ct. 1103, 1107 (2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). The test is applied to claims of ineffective assistance of counsel at any stage of the litigation. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

In *Strickland*, the Supreme Court found that the district court had properly declined to issue a writ of *habeas corpus*. *Strickland*, 466 U.S. at 701 (holding trial counsel's performance at sentencing where defendant received death sentence after initial guilty plea was neither unreasonable, nor prejudicial). Counsel, it explained, had not made an objectively unreasonable choice of litigation strategy by choosing not to request a presentence report, conduct a psychiatric examination of his client, or seek out character witnesses in preparation for his client's sentencing hearing. *Id.* at 699. The Court emphasized that reasonable strategic choices by counsel after an appropriate investigation of the facts and law are "virtually unchallengeable." *Id.* at 690–91. Those "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* The responsibility rests with petitioner to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 688 (citation omitted).

76

The decision to rely on the plea colloquy for evidence related to respondent's extreme stress caused by his inability to support his family was found reasonable because it prevented the State from cross-examining character witnesses and presenting psychiatric evidence of its own. *Id.* at 699. Counsel's failure to request a presentence report was not deemed ineffective because the report would have contained information about respondent's criminal history and undermined the claim that he had no significant prior criminal record. *Id.*

The lack of merit regarding the prejudice component of the ineffective assistance of counsel claim was ruled "even more stark." *Id.* at 700. The Court wrote:

> [E]ven assuming the challenged conduct of counsel was unreasonable, respondent suffered insufficient prejudice to warrant setting aside his death sentence. . . . [T]here [was] no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances [of the three capital murder crimes] outweighed the mitigation circumstances and, hence, the sentence imposed.

*Id.* at 698–700.

The performance and prejudice prongs of *Strickland* may be addressed in either order. *Id.* at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001) (granting writ of *habeas corpus* because counsel's cumulative errors—including failure to effectively challenge only evidence of physical sexual abuse and expert testimony based on unnamed available studies—amounted to constitutional ineffectiveness and prejudiced petitioner). *But see Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014) (per curiam) (holding that defense counsel's failure to request additional

funds to replace an inadequate expert amounted to deficient performance; "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (citations omitted)).

The standard for evaluating counsel's assistance is a "most deferential one[.]" *Harrington*, 562 U.S. at 105 (holding that state court's acceptance of counsel's decision not to consult blood evidence experts was not an unreasonable application of *Strickland*). State court determinations are given heightened deference under section 2254(d) of title 28 of the United States Code. *See supra* Part IV.B. A federal court reviewing a state court's determination regarding ineffective assistance of counsel has been characterized as "doubly" deferential by the Supreme Court. *Harrington*, 562 U.S. at 105. When applying section 2254(d), "the question is not whether counsel's actions were reasonable[,]" but "whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Id.* (emphasis added).

The Court of Appeals for the Second Circuit has explained that "[i]n assessing counsel's performance . . . , we must apply a heavy measure of deference to counsel's judgments." *Griener v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) (citations omitted) (holding counsel's decision not to call unfriendly witnesses to suggest that a third party had motive to kill the victim was not deficient); *see also, e.g.*, *Lopez v. Rivera*, 157 F. App'x. 358, 360 (2d Cir. 2005) (summary order) (finding state court reasonably concluded counsel rendered meaningful assistance, and that there was no evidence that a strategy pursuing an alibi defense would have supported defendant's claim).

A counsel's performance will be found unreasonable or ineffective *only* "when it is so deficient that it falls outside the wide range of professionally competent assistance." *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014) (holding "no reasonable jurist could find a defense

counsel's affirmative misadvice as to the immigration consequences of a guilty plea to be objectively reasonable" (citations omitted)); *Rivas v. Fischer*, 780 F.3d 529, 549–51 (2d Cir. 2015) (holding state court unreasonably applied *Strickland* test because counsel's failure to investigate expert testimony, which called into doubt the central forensic evidence linking the inmate to the crime, was ineffective assistance and prejudicial to defendant).

With respect to ineffective assistance of counsel claims previously decided upon by a state court, petitioner must go beyond "convinc[ing] a federal habeas court that, in its independent judgment[,] the state court applied *Strickland* incorrectly." *Cox v. Donnelly*, 387 F.3d 193, 197 (2d Cir. 2004) (citations omitted) (finding counsel's failure to object to unconstitutional jury instruction objectively unreasonable and prejudicial). Petitioner "must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.*; *see also United States v. Marks*, 561 F. App'x 42, 45 (2d Cir.) (summary order), *cert. denied*, 135 S. Ct. 301 (2014) (denying petitioner's ineffective assistance of counsel claim and explaining that to establish *Strickland* prejudice at the plea phase, "a defendant must show that but for the ineffective assistance of counsel there is a reasonable probability that the defendant would have accepted the plea.").

### 2. Rule as Applied to Trial Counsel

Second guessing from the federal bench is seldom appropriate with respect to the tactical and strategic choices made by trial counsel in the heat of trial.

### a. Calling of Witnesses on Behalf of Defendant

Counsel's decision to call witnesses on behalf of defendant "is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) (finding counsel's alleged failure to call witnesses to vouch for defendant's integrity and to corroborate his testimony regarding business information fell within

the realm of a tactical decision); *see also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (finding counsel made tactical decision in choosing not to call witness as an expert, but as a layperson, and stated that "failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel"); *McDowell v. Heath*, No. 09-CV-7887, 2013 WL 2896992, at *36 (S.D.N.Y. June 13, 2013) (denying an ineffective assistance of counsel claim based on a failure to procure an expert witness because there was no evidence that counsel had not considered the option and did not call the expert witness for a tactical purpose). Counsel's decision "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *United States v. Schmidt*, 105 F.3d 82, 83 (2d Cir. 1997)) (finding decision not to call witness that would have opened an opportunity for government to attack defendant's character was "surely a tactical decision and cannot be second guessed").

**b. Failure to Object to or Request Additional Jury Instruction**

The Court of Appeals for the Second Circuit has held that "counsel's failure to object to a jury instruction (or to request an additional instruction) constitutes unreasonably deficient performance *only* when the trial court's instruction contained clear and previously identified errors." *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (emphasis added) (citations omitted). In *Arapicio*, the court was faced with a *habeas* claim predicated in relevant part on the alleged ineffective assistance provided by trial counsel after he failed to request a cautionary jury instruction on eyewitness testimony. *Id.* After examining the relevant law of New York State, the Court of Appeals held that "when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance." *Id.*; *see also, e.g., Jones v. New York*, No. 10-CV-9176, 2013 WL 208904, at * 2 (S.D.N.Y. Jan.16,

2013) (ruling that counsel could not be ineffective for failing to object to jury instructions and evidentiary rulings that were found to be proper, and that any purported error on the part of counsel "would have been harmless and would not have affected the outcome of the trial"). *But see Cox v. Donnelly II*, 432 F.3d 388, 390 (2d Cir. 2005) (defense counsel's failure to object to erroneous jury instruction that impermissibly shifted burden of proof to defendant deprived defendant of effective assistance in murder trial because counsel had no strategic reason for his failure to object, and his failure to object was due to his own ignorance or misunderstanding of both New York and constitutional law).

### c. Wide Range of Conduct Considered Reasonable

Courts routinely refuse to find ineffective assistance of trial counsel given the wide range of conduct considered reasonable. *See, e.g., Purdy v. United States*, 208 F.3d 41, 47–48 (2d Cir. 2000) (even though counsel "never advised [his client] in so many words" about whether to plead guilty it was held that attorney provided defendant with sufficient information to make an informed decision, such as the strength of the government's case and other benefits of pleading guilty); *Occhione v. Capra*, No. 14-CV-3637, 2015 WL 3879534, at *16 (E.D.N.Y. June 24, 2015) (nine claims of ineffective assistance of counsel fail because all are related to trial strategy); *Mosiurchak v. Senkowski*, 839 F. Supp. 1035, 1041 (S.D.N.Y. 1993) (denying petitioner's ineffective assistance of counsel claim where state court independently vacated petitioner's plea deal over prosecution's objection, and where it was alleged that counsel had been ineffective for failing to adequately challenge plea's *vacatur* and seek reinstatement of the original plea); *see also Melendez v. Heath*, No. 10-CV-5698, 2014 WL 2440499, at *5 (E.D.N.Y. May 30, 2014), *appeal filed* No. 14-1880 (2d. Cir. June 3, 2014) (finding "counsel's failure to move to dismiss the course of sexual conduct charges on the basis of failure to prove the three-month duration element was not a waiver of 'a particularly strong and clear' claim"); *Garcia v.*

*Smith*, No. 11-CV-1332, 2014 WL 905544, at *20–21 (E.D.N.Y. Mar. 7, 2014) ("Counsel's decision not to argue that [petitioner] was the 'operator' of the car was a tactical one that cannot give rise to an ineffectiveness claim."); *Johnson v. Taylor*, No. 08-CV-2442, 2010 WL 2735770, at *4–6 (E.D.N.Y. July 8, 2010) (denying *habeas* relief where it was alleged that counsel failed to adequately investigate the identity of the individual who owned the residence where petitioner was arrested, refrained from conducting inapplicable research, and waived his client's grand jury testimony).

Where it is claimed that counsel failed to move for a violation of his or her client's right to speedy trial, a thirty month delay between arraignment and trial has not been deemed sufficient to warrant post-conviction relief. *See Mallet v. Miller*, 432 F. Supp. 2d 366, 384 (S.D.N.Y. 2006) (denying ineffective assistance of counsel claim based on counsel's failure to move for a violation of right to speedy trial where there was a delay of thirty months between arraignment and trial due to pretrial hearings and inability of the prosecution to locate a key witness, and where the underlying speedy trial claim was meritless); *see also Curnen v. Yelich*, No. 11-CV-7499, 2015 WL 3827693, at *9 (S.D.N.Y. June 19, 2015), *appeal filed* No. 15-2166 (2d Cir. July 8, 2015) (denying petitioner's ineffective assistance of counsel claim premised on allegations that counsel had refused to file a motion for relief with respect to violation of petitioner's right to a speedy trial where the lower court would have rejected claim as meritless, and where petitioner could not have shown prejudice because government could have acquired new indictment on the same conduct); *Walker v. Bennett*, 262 F. Supp. 2d 25, 37 (W.D.N.Y. 2003) (denying petitioner's ineffective assistance of counsel claim premised upon counsel's alleged failure to move for recovery from a speedy trial where the under lying speedy trial claim "would not have been successful[.]").

"Failure to make a meritless argument does not amount to ineffective assistance." *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999) *abrogated on other grounds by United States v. Sekhar*, 683 F.3d 436 (2d Cir. 2012) *rev'd* 133 S.Ct. 2720 (2013) (holding defendant's right to counsel not violated despite district court denying pretrial request by the defendant to discharge his attorney where request was made on eve of trial and was openly part of attempt to have the district judge recuse himself and delay trial).

### 3. Rule as Applied to Appellate Counsel

Prejudice may be shown when a defendant is denied adequate counsel at the appellate level. *See Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage. The same is true on appeal." (citations omitted)). Should a defendant have access to counsel, prejudice may be found if that counsel fails to file a direct appeal. *See id.* at 484. To establish prejudice, the Supreme Court explained that "a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.*

"[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (remanding to determine if counsel's failure to submit any merits briefing whatsoever sufficiently prejudiced petitioner under *Strickland*). Although "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, [ ] it is difficult to demonstrate that counsel was incompetent." *Id.* (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of

counsel be overcome.")); *see also Parks v. Sheahan*, No. 14-CV-4785, 2015 WL 2359580, at

*14 (E.D.N.Y. May 15, 2015) (finding state court's conclusion that appellate counsel acted

reasonably, despite allegedly failing to make arguments pertaining to prosecution's opening

statement and alleged false testimony of its witness, did not violate federal law given "the high

standard to show deficient performance" articulated in Supreme Court precedent); *Osborn v.

Shillinger*, 997 F.2d 1324, 1328 (10th Cir. 1993) (affirming denial of *habeas* petition and holding

defendant was not prejudiced by counsel's failure to appeal an interlocutory ruling that allowed

state to pursue death penalty on retrial when there was no constitutional bar to seeking death

penalty).

      The Court of Appeals for the Second Circuit has held that prejudice will be presumed

when a defendant's counsel fails to file a direct appeal when instructed to do so by his or her

client. *See In re Aranda*, No. 14-90027, 2015 WL 3367961, at *6 (2d Cir. May 22, 2015)

("[P]rejudice is presumed when a criminal defendant instructs his attorney to pursue a direct

appeal from the judgment of conviction and the attorney fails to do so."); *Roe*, 528 U.S. at 478

("If counsel has consulted with the defendant, the question of deficient performance is easily

answered: Counsel performs in a professionally unreasonable manner only by failing to follow

the defendant's express instructions with respect to an appeal."). This rule extends to a

defendant who has previously waived his or her right to appeal by virtue of having entered into a

plea agreement. *See Campusano v. United States*, 442 F.3d 770, 771–72 (2d Cir. 2006) (finding

ineffective assistance of counsel where counsel failed to file notice of appeal when requested to

do so, even though defendant had waived right to appeal as part of plea agreement). Where a

defendant fails to provide proof of such a request ever having been made, prejudice is not

presumed. *See Persaud v. United States*, No. 12-CV-2051, 2012 WL 5199371, at *6 (S.D.N.Y.

Oct. 22, 2012).

## B. Application

Petitioner's allegations regarding his trial and appellate counsels' numerous and cumulative errors, thirty in total, do not rise to the level of a Sixth Amendment violation. Neither prong of the *Strickland* test is satisfied. *See supra* Part IX.A.1. The state court did not apply the *Strickland* standard in an objectively unreasonable manner. *See supra* Part IV.B. No objective lack of reasonableness on the part of counsel is detected. No sufficient prejudice to warrant setting aside the conviction exists. The evidence regarding petitioner's guilt is overwhelming. *See supra* Parts II.A.1 & III.D.1

Petitioner's claim regarding trial counsel's alleged failure to adequately object to the information supplied by CCR is of no moment. A sentencing court may consider a wide variety of information from multiple sources. *See supra* Part V.B.2.

The argument that he received ineffective assistance of counsel because his trial attorney failed to appeal the trial court's *vacatur* of the plea deal also fails. The *vacatur* of the plea by the trial court was not improper. Because counsel properly pursued a direct appeal on behalf of petitioner, his appellate counsel cannot be deemed to have been prejudiced by his previous trial counsel's decision not to file an interlocutory appeal. *See supra* Parts III.G & IX.A.3.

Petitioner's assertion that his trial counsel failed to raise a double jeopardy claim after the *vacatur* of the plea and seek a *writ of mandamus* preventing the judge from vacating the plea are equally without merit. No cognizable double jeopardy claim was available to petitioner, nor was there significant likelihood that a *writ of mandamus* would have been granted on the facts. *See supra* Parts III.C & VI.B. Trial counsel's decision not to pursue the double jeopardy claim or the

*writ of mandamus* prior to trial was a strategic choice and was not unreasonable. *See supra* Part IX.A.2.

Petitioner makes multiple claims alleging that the outcome of his trial was prejudiced because his trial counsel failed to object or file multiple motions at different points throughout the trial, refused to call an expert witness in his defense, and failed to advocate on his behalf for a more thorough jury charge. These claims fail. They amount to little more than a roving, superficial critique of trial counsel's strategy.

The argument that his counsel failed to effectively advocate on his behalf during post-trial sentencing is not supported by the record. His counsel in fact spoke passionately in support of his client. *See, e.g.*, Oct. 28, 2008 Hr'g Tr. 8:22–16:11.

The evidence in the record with respect to petitioner's guilt of the crimes charged is overwhelming. *See supra* Parts II.A.1 & III.D.1. Prejudice from trial counsel's errors is not sufficient to warrant setting aside the conviction. *See supra* Parts IV & IX.A.1.

The assertion that petitioner's appellate counsel failed to pursue proper claims on direct appeal lacks merit. Appellate counsel made reasonable choices regarding which arguments to pursue on appeal. The additional arguments proffered by petitioner were addressed by the appellate division and dismissed summarily. *See supra* Part III.G.

All ineffective assistance of counsel claims are dismissed.

## X.     Conclusion

The *habeas corpus* petition is dismissed. The defendant had a fair trial.

A certificate of appealability is granted with respect to the double jeopardy claim, including failure to impose a sentence of one to three years incarceration. This area of the law is somewhat opaque. It may need reconsideration in the present case, where petitioner may not have realized that the five counts avoided in the original plea agreement would be reinstated if he

went to trial, and where failure to apply double jeopardy led to a significant increase in defendant's sentence.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: August 14, 2015
Brooklyn, New York